No. 20-50345

# In the United States Court of Appeals

# for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

JONATHAN EDWARD CHARLES ANDERSON,
*Defendant-Appellant*.

On Appeal from the United States District Court
for the Central District of California, Southern Division
The Honorable R. Gary Klausner, Presiding
No. CR-5:20-0071-RGK-1

## Appellant's Opening Brief

CUAUHTEMOC ORTEGA
Federal Public Defender
ASHWINI MATE
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012
213-894-1417

*Counsel for Defendant-Appellant*

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................1

II. QUESTIONS PRESENTED ...................................................................4

    A.    Should this Court reverse the district court's oral order denying Mr. Anderson's motion to suppress because the deputies relied on the inventory search exception as a pretext to investigate for evidence of criminal wrongdoing?..........................................................4

    B.    Should this Court remand to the district court to revise a condition of supervised release that it has already found unconstitutionally vague?.................................................................................................4

III. STATEMENT OF ADDENDUM.............................................................4

IV. STATEMENT OF THE CASE .................................................................4

    A.    Statement of Jurisdiction.................................................................4

    B.    Custody Status.................................................................................5

    C.    Course of Proceedings and Statement of Facts.....................................5

        1.    The Uncontested facts of the Warrantless Search and Seizure of Mr. Anderson's Truck. ................................................6

        2.    Relevant Provisions of California Law and SBCSD policies regarding inventory searches .......................................9

        3.    Summary of the Suppression Pleadings...................................13

        4.    Summary of Hearing Testimony..............................................19

        5.    Summary of Hearing Arguments and Court's Decision...........22

        6.    Plea and Sentencing ...............................................................24

V. SUMMARY OF ARGUMENT...............................................................25

# TABLE OF CONTENTS

**Page**

VI.    ARGUMENT ...................................................................................28

    A.    The district court committed reversible error when it denied Mr. Anderson's suppression motion. The deputies used the inventory search exception to the warrant requirement as a pretext to rummage for evidence after they discovered that he had a criminal record. They were in the truck searching within minutes of stopping Mr. Anderson, without statutory authority or a community caretaking purpose to do so and they never inventoried the contents of the truck. ...................................................28

        1.    Legal Standards ....................................................................28

        2.    The deputies' reliance on the fact that Mr. Anderson was driving unlicensed as a reason to impound and search Mr. Anderson's car was insufficient on its own. The deputies needed a community caretaking reason to impound the vehicle. ..............................................................................30

        3.    There was no community caretaking reason apparent at the time the deputies conducted the search. The deputies did not speak to the homeowner to ascertain whether the truck was blocking his driveway before they searched and found the gun. The district court's finding to the contrary was clearly erroneous based on unassailable nonspeculative recorded evidence. ....................................................................33

        4.    The inevitable discovery doctrine is inapplicable here, the government cannot, and did not even try to, carry its burden of proving that a second lawful search would have occurred ...39

        5.    The actual search demonstrates that the deputies had an impermissible investigatory purpose because they failed to accomplish the most basic purpose of an inventory search according to SBCSD policies: producing an inventory. ...........44

        6.    The deputies' intent was to search the car and rummage for criminal evidence. ...................................................................49

# TABLE OF CONTENTS

**Page**

B.      The district court committed plain error when it imposed a notification condition that is just as unconstitutionally vague as the notification conditions struck down in *United States v. Evans*, 883 F.3d 1154 (9th Cir. 2018)...........................................................52

     1.      Standard of Review.................................................................52

     2.      As this Court has already found, the reformulated Standard Condition 14 is still unconstitutionally vague. ........................52

VII.   CONCLUSION.................................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Camara v. Mun. Court of City & Cty. of San Francisco,*
  387 U.S. 523 (1967).................................................................................29

*Colorado v. Bertine,*
  479 U.S. 367 (1987)..........................................................................*passim*

*Florida v. Wells,*
  495 U.S. 1 (1990).......................................................................2, 44, 47

*Miranda v. City of Cornelius,*
  429 F.3d 858 (9th Cir. 2005) ...................................................29, 30, 42

*Murray v. United States,*
  487 U.S. 533 (1988)................................................................................40

*Nix v. Williams,*
  467 U.S. 431 (1984)................................................................................39

*Ramirez v. City of Buena Park,*
  560 F.3d 1012 (9th Cir. 2009) ...............................................................44

*South Dakota v. Opperman,*
  428 U.S. 364 (1976)............................................................................1, 2

*United States v. Andrade,*
  784 F.2d 1431 (9th Cir.1986) ................................................................39

*United States v. Barnes,*
  895 F.3d 1194 (9th Cir. 2018) ...............................................................28

*United States v. Caseres,*
  533 F.3d 1064 (9th Cir. 2008) ...............................................................45

*United States v. Cervantes,*
  703 F.3d 1135 (9th Cir. 2012) .....................................................28, 29, 31

*United States v. Evans,*
  883 F.3d 1154 (9th Cir. 2018) .....................................................27, 52, 53

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases (cont…)**

*United States v. Garay*,
  938 F.3d 1108 (9th Cir. 2019) ....................................................................47, 48

*United States v. Hellman*,
  556 F.2d 442 (9th Cir. 1977) ..............................................................................45

*United States v. Job*,
  871 F.3d 852 (9th Cir. 2017) ..............................................................................28

*United States v. Johnson*,
  889 F.3d 1120 (9th Cir. 2018) ........................................................16, 17, 18, 49

*United States v. Joseph*,
  716 F.3d 1273 (9th Cir. 2013) ......................................................................53, 54

*United States v. LaCoste*,
  821 F.3d 1187 (9th Cir. 2016) ............................................................................54

*United States v. Lara*,
  815 F.3d 605 (9th Cir. 2016) ..............................................................................28

*United States v. Maddox*
  614 F.3d 1046, 1049 (9th Cir. 2010) ..................................................................42

*United States v. Magdirila*,
  962 F.3d 1152 (9th Cir. 2020) ....................................................................*passim*

*United States v. Moore*,
  655 Fed. Appx. 531 (9th Cir. 2016)....................................................................44

*United States v. Ruckes*,
  586 F.3d 713 (9th Cir. 2009) ........................................................................39, 40

*United States v. Torres*,
  828 F.3d 1113 (9th Cir. 2016) ............................................................................40

*United States v. Wanless*,
  882 F.2d 1459 (9th Cir. 1989) ............................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases (cont…)**

*United States v. Wolf Child*,
  699 F.3d 1082 (9th Cir. 2012) ...................................................................52

**State Cases**

*People v. Williams*,
  145 Cal.App.4th 756 (Cal. App. 2006)...................................................31, 40, 48

**Constitutional Provisions**

U.S. Const. amend. IV ....................................................................*passim*

U.S. Const. amend. XIV ....................................................................30

**Federal Statutes and Rules**

18 U.S.C. § 922(g)(1)....................................................................5, 6

18 U.S.C. § 3231 ....................................................................5

18 U.S.C. § 3742 ....................................................................5

28 U.S.C. § 1291 ....................................................................5

Fed. R. App. P. 4(b)(1)(A)(i) ....................................................................5

Circuit Rule 27-13(d) ....................................................................5

Circuit Rule 28-2.7....................................................................4

Circuit Rule 30-1.5(c) ....................................................................5

Circuit Rule 30-1.6....................................................................4

**State Statutes**

Cal. Veh. Code § 22651 ....................................................................*passim*

Cal. Veh. Code § 12500 ....................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

**Other Authorities**

Krista Doyle, *What are Your Rights when You get pulled Over?*,
   ACEABLE, https://tinyurl.com/8reccz77 ...............................................................43

Tom Forman, Assoc. Press, *Army Lieutenant Sues Police for Pepper
   Spraying, Threatening Him During Stop*, ARMY NEWS (April 10,
   2021) https://tinyurl.com/37baz8p6.....................................................................43

United States District Court for the Central District of California,
   General Order 20-04, *available at*:
   https://www.cacd.uscourts.gov/sites/default/files/general-
   orders/GO%2020-04%20Second%20Amended.pdf (last visited
   April 12, 2021)...............................................................................................24

## I. INTRODUCTION

Jonathan Anderson was driving his truck trying to locate a friend's house at 2:01 a.m. on November 13, 2019, when San Bernardino County Sherriff's Department ("SBCSD") Deputy Daniel Peterson noticed his truck had a ball hitch obscuring part of his license plate. Mr. Anderson was subsequently detained by 2:04 in the morning. In the span of four minutes and 40 seconds from the time that Mr. Anderson was detained, the deputies on the scene discovered Mr. Anderson's license was expired, determined that he had an extensive criminal record, searched his truck, found a gun, located the serial number and called it into dispatch.

The deputies arrested Mr. Anderson for the gun and filled out a vehicle report ("CHP 180 Form") to inventory the contents of his truck before it was towed. However, neither deputy listed any of the personal items in the truck besides the gun. At some point, the deputies also learned that the homeowner of the driveway did not know Mr. Anderson.

The searching deputies justified the warrantless search and seizure of Mr. Anderson's truck as an inventory search. Administrative inventory searches of vehicles are an exception to the usual Fourth Amendment warrant requirement. *See Colorado v. Bertine*, 479 U.S. 367, 371 (1987). This exception exists to account for an officer's need to impound a vehicle. *South Dakota v. Opperman*, 428 U.S. 364, 368-370 (1976). Such an impoundment must be justified under the community

1

caretaking doctrine, when a vehicle poses a safety threat or a traffic hazard to the public. *Id*. If a vehicle is impounded under this doctrine, and thus transferred into government hands, officers need to enter the vehicle to generate an inventory of the personal property therein to avoid claims of loss, damage, and theft. *Id*. The Supreme Court has made it clear that because of the administrative need to inventory the property in these impounded vehicles, such searches should not be used as a ruse for criminal investigatory purposes. *Florida v. Wells*, 495 U.S. 1, 4 (1990).

Here, the arresting deputies clearly did exactly that by using an inventory search as a pretext to search for evidence of criminal wrongdoing the moment they learned Mr. Anderson was a career criminal. For one thing, the deputies did not need to immediately impound Mr. Anderson's truck under their community caretaking function. Simply put, the deputies had no community to care for — the only community that could have been impaired by the position of the truck was the homeowner and they did not try to speak to the homeowner before the search. Thus, there was no reason for the deputies to believe that a truck parked in a private driveway of a residential home was a safety threat or a traffic hazard.

Moreover, the deputies did not even attempt to safeguard any of Mr. Anderson's personal items in the truck, which is the purpose behind the inventory search exception. They never created an inventory of anything it contained except

2

the contraband gun. Meanwhile, there were several important personal items in the truck, including a speaker, tools, expensive sunglasses, an expensive watch and a bottle of cologne.

However, the district court never reached this second argument. After conducting a hearing on Mr. Anderson's motion to suppress, the district court denied it in a short and bare oral order. The district court noted that there were many inconsistencies and discrepancies in the witness' testimony but believed that the truck was searched *after* the deputies discovered that the homeowner wanted the truck removed. However, unassailable evidence in the form of an audio recording of the incident and a dispatch log demonstrate that the deputies could not have spoken to the homeowner prior to searching the car. Therefore, the court's finding on this point was clearly erroneous and this Court should not defer to it.

The district court also alternatively mentioned that the inevitable discovery doctrine might apply even if the deputies did not speak to the homeowner until after the search, and thus concluded that "the search was proper," without any further explanation. But the inevitable discovery is inapplicable here because the government cannot carry its burden of proving that a separate lawful search would have inevitably occurred, which is perhaps why the government never tried to below. Instead, the government relied on Mr. Anderson's violation of the vehicle

3

code to justify impounding and searching the truck, which is insufficient justification on its own.

The search here was clearly improper, and this Court should reverse the district court's order finding otherwise.

## II. QUESTIONS PRESENTED

A.  **Should this Court reverse the district court's oral order denying Mr. Anderson's motion to suppress because the deputies relied on the inventory search exception as a pretext to investigate for evidence of criminal wrongdoing?**

B.  **Should this Court remand to the district court to revise a condition of supervised release that it has already found unconstitutionally vague?**

## III. STATEMENT OF ADDENDUM

In accord with Ninth Circuit Rule 28-2.7, pertinent constitutional provisions, treaties, statutes, ordinances, regulations, and rules are set forth in the addendum attached to this brief.

## IV. STATEMENT OF THE CASE

### A. Statement of Jurisdiction

This appeal is from a judgment rendered by the Honorable R. Gary Klausner, United States District Judge, on November 30, 2020. (2-ER -16-19).[1]

---

[1] "ER" refers to the three volumes of Appellant's Excerpts of Records and is preceded by the volume number followed by the applicable page, as required by Circuit Rule 30-1.6. The page numbers across all of the volumes are consecutive starting with the first volume, and including the caption pages, pursuant to Circuit

4

Appellant Jonathan Anderson filed a timely notice of appeal on December 3, 2020. (2-ER-15); Fed. R. App. P. 4(b)(1)(A)(i). The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

### B. Custody Status

Mr. Anderson is in the custody of the Bureau of Prisons ("BOP") serving his sentence of 77 months. However, he is not listed on the website, nor is his release date. He is still being held at the Central Detention Center in San Bernardino.

### C. Course of Proceedings and Statement of Facts

Mr. Anderson was convicted of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). (2-ER-16-19). His conviction was pursuant to a conditional plea permitting Mr. Anderson to appeal the district court's denial of his motion to suppress. (2-ER-20-36). Mr. Anderson's motion to suppress arose out of the warrantless search and seizure of his truck by SBCSD deputies on November 13, 2019. (2-ER-60).

---

Rule 30-1.5(c). "PSR" refers to the Presentence Report filed under seal pursuant to Circuit Rule 27-13(d). "Ex." refers to the audio recordings that were submitted as exhibits to Mr. Anderson's motion to suppress and that are the subject of a Motion for Leave to Transmit Physical Exhibits which is being concurrently filed with his brief.

1. **The Uncontested facts of the Warrantless Search and Seizure of Mr. Anderson's Truck.[2]**

On November 13th, 2019, at approximately 2:01 a.m., Deputy Peterson noticed the truck Mr. Anderson was driving in Phelan, California. (3-ER-388). Specifically, he noticed that the license plate was obscured by a ball hitch attached to the bumper, a vehicle code violation. (*Id.*). Despite the obstruction, Deputy Peterson was still able to read the plate number and call it into dispatch. (3-ER-311). Deputy Peterson then conducted a traffic stop and reported that Mr. Anderson was "slowed, stop and pulling into an apartment complex" just before 2:02 in the morning. (3-ER-311, 314; Ex. 3A at 00:19).

Mr. Anderson parked his truck in the driveway of 9592 Chaparral Court, the third house on the left-hand side of the street, and exited his truck. (3-ER-388). Deputy Peterson activated his recording equipment ("Recording") and confronted Mr. Anderson at gunpoint. (3-ER-301-302). On the Recording, Deputy Peterson repeatedly ordered Mr. Anderson to turn around and put his hands up for a minute and twenty-two seconds, even though Mr. Anderson stated that his hands were up within seventeen seconds. (3-ER-301-304; Ex. 1A at 0:00-1:22). During this time, Deputy Peterson demanded Mr. Anderson drop whatever was in his hands and a

---

[2] Most of the information in the following section is based on the recordings and logs from the night of the incident, along with the vehicle report filled out that night.

noise like the sounds of keys dropping is audible on the Recording. (3-ER-304; Ex. 1A at 00:57). Shortly thereafter, Deputy Schuler arrived, and, according to the dispatch log ("Log"), Deputy Peterson reported that Mr. Anderson was detained by 2:04:05 in the morning. (3-ER-304, 311; Ex. 1A at 1:19).

Deputy Peterson then asked Mr. Anderson who lived in the house at 9592 Chaparral Court. (3-ER-304-305; Ex. 1A at 1:45-2:18). Mr. Anderson stated his belief that the house belonged to a friend and volunteered that his driver's license was expired. (3-ER-305-306; Ex. 1A at 2:19-2:37). At 2:04:48 a.m., Deputy Peterson radioed dispatch to ask for information about Mr. Anderson. (3-ER-306; Ex. 1A at 2:39). Approximately a minute later, the dispatcher responded with Mr. Anderson's arrest history and stated that he was a career criminal. (3-ER-311).

During that minute, the deputies asked Mr. Anderson a lot of questions indicating that they suspected he was guilty of more than a violation of the vehicle code. (3-ER-305-306; Ex. 1A at 2:47-3:55). For example, Deputy Schuler questioned why Mr. Anderson was carrying a lot of money, and why he had gloves. (*Id.*). Mr. Anderson stated that he was doing mechanic work, and that it was not a lot of money. (*Id.*). Deputy Peterson asked Mr. Anderson why he did not yield to patrol vehicle's lights during the stop, and why he had parked and jumped out of his truck. (*Id.*). Mr. Anderson denied doing any of that. (*Id.*).

Immediately after these statements, Mr. Anderson can be heard objecting to

the deputies searching his truck. (3-ER-307-308; Ex. 1A at 4:05-4:20) ("You can't check my truck… "Why can you search my truck?). Lined up against the timeline presented in the Log, this would have had to have occurred at approximately 2:06:14 a.m., and the Log states that the deputies were informed that Mr. Anderson was a career criminal at 2:05:36 in the morning.[3] In other words, it took the deputies approximately thirty-eight seconds to start searching Mr. Anderson's truck after learning that he had a criminal record.

In response to Mr. Anderson's queries about why they could search his truck, the deputies responded that they were doing an inventory search because they were going to tow the truck since Mr. Anderson did not have a valid license. (3-ER-307; Ex. 1B at 4:11-4:14). A tow truck, however, was not called under later that morning after Mr. Anderson was arrested. (3-ER-312).

Mr. Anderson continued to protest, repeatedly asking if he could have a friend come get the truck, but the deputies said "no." (3-ER-308; Ex. 1B at 4:21-4:23). While Mr. Anderson continued to protest the search, the deputies placed him in the back of a patrol vehicle and Deputy Peterson told him that Mr. Anderson that he was not under arrest just before shutting off the Recording. (3-ER-309; Ex.1B at 4:45-5:00). Lining up the Log and Recording again, this had to have been

---

[3] For the Court's convenience, Mr. Anderson has included a chart lining up the Recording and the Log in the argument below, section IV.A.3.

at 2:07:14 in the morning. According to the Log, a little over a minute later, at approximately 2:08:46 a.m., Deputy Peterson called in the gun's brand and serial number. (3-ER-311).

Mr. Anderson was subsequently arrested, and Deputy Schuler filled out the CHP 180 Form, or vehicle report. (2-ER-252). The Form noted that Mr. Anderson's truck was to be "stored" and that the reason for storing it was Cal. Vehicle Code § 22651(h). (3-ER-359-360). The Form also provided a section where all personal property found in the truck could have been inventoried, but the only item mentioned there was the gun. (*Id.*). Later that morning, Deputy Peterson signed the CHP 180 Form, although he had not written it. (2-ER-252).

At 2:30 a.m., Deputy Peterson transported Mr. Anderson to the High Desert Detention Center. (3-ER-312). The tow truck driver arrived at 2:53 a.m., (3-ER-312), and towed the truck/signed the CHP 180 Form around 3:03 in the morning. (3-ER-359-360).

At some point during the incident, a deputy spoke with the homeowner, Michael Wallace, about Mr. Anderson. (3-ER-389). Mr. Wallace told the deputy who knocked on his door that he did not know Mr. Anderson or the vehicle. (*Id.*).

### 2. Relevant Provisions of California Law and SBCSD policies regarding inventory searches

California Vehicle Code § 22651 describes the "circumstances permitting removal" of vehicles "located within the territorial jurisdiction" by "peace

officers." In the Recording, the deputies appeared to rely on subsection (p) to justify why they were towing and thus searching the truck. (3-ER-307). Subsection (p) permits a vehicle's removal if the driver is unlicensed and law enforcement issues the driver with a Notice to Appear for that violation of the vehicle code:

> (p) If the peace officer issues the driver of a vehicle a notice to appear for a violation of Section 12500, 14601, 14601.1, 14601.2, 14601.3, 14601.4, 14601.5, or 14604, and the vehicle is not impounded pursuant to Section 22655.5. A vehicle so removed from the highway or public land, or from private property after having been on a highway or public land, shall not be released to the registered owner or his or her agent, except upon presentation of the registered owner's or his or her agent's currently valid driver's license to operate the vehicle and proof of current vehicle registration, to the impounding law enforcement agency, or upon order of a court.

Cal. Veh. Code § 22651(p). Driving with an expired license is a violation of California Vehicle Code § 12500, but no such citation was issued to Mr. Anderson. On the CHP 180 Form, the deputies relied on subsection (h) to justify the impoundment, which permits a vehicle's removal if the driver is arrested:

> (h) If an officer arrests a person driving or in control of a vehicle for an alleged offense and the officer is, by this code or other law, required or permitted to take, and does take, the person into custody.

(3-ER-359); Cal. Veh. Code § 22651(h). Mr. Anderson was not placed under arrest until after his car was searched and the gun was found. Another relevant provision of this code is subsection (d):

(d) If a vehicle is illegally parked so as to block the entrance to a private driveway and it is impractical to move the vehicle from in front of the driveway to another point on the highway.

Cal. Veh. Code. § 22651(d). Neither party referenced this subsection during the proceedings below.

SBCSD has two separate policies and procedures for storing and impounding vehicles, each setting forth different criteria for a deputy's consideration. (3-ER-343-352). Deputy Schuler listed that they were "storing" Mr. Anderson's car on the CHP 180 Form, although it was described throughout the proceedings below as an impoundment. (3-ER-359). The policies for both are as follows:

**3.564.10 Criteria for Storing Vehicles**
When the driver of a vehicle is arrested for any Vehicle Code section relating to driving under the influence of alcohol and/or drugs or for mental illness, the arresting officer shall do one (1) of the following:
  • Store the arrestee's vehicle for safekeeping.
  • Leave the vehicle legally parked.
  • Have a passenger, who is not intoxicated, take the vehicle after considering:
        o The extent of intoxication of the arrestee and his ability to make a rational decision to permit the vehicle to stay at the scene or allow the passenger to take his vehicle.
        o The condition of the area the vehicle is to be left at (i.e., hazardous traffic flow, high crime rate area, etc.).

Otherwise the following listed criteria may be considered in storing a vehicle:

11

- Where the vehicle is abandoned.
- When the vehicle is a traffic hazard.
- When the officer recovers a stolen vehicle, and the originating report was taken at this station/division and the owner is unavailable at the time of the recovery.
- When an arrest is made, and the driver refuses to leave the vehicle at the scene.
- When the vehicle is abandoned and stripped of all identifiable numbers or markings.

**3.566. Criteria for Impounding Vehicles**
The following listed criteria may be considered in impounding a vehicle:
- When the vehicle must be held for investigation (i.e., collection of evidence, searching, etc.).
- When the vehicle is involved in civil proceedings where fees and penalties are due.
- When the vehicle has altered or missing identification.
- When the vehicle is suspected of being involved in a hit and run traffic collision.
- When the vehicle is recovered stolen or involved in a crime where the teletype broadcast specifies "Hold" and shall be impounded.

(3-ER-343-352). Pursuant to policy number 3.564.10, the guidance for when a deputy can store a vehicle when an arrest is made, states that the driver "Refuses to leave the vehicle at the scene." (3-ER-343). Neither deputy asked Mr. Anderson if he wanted to leave his vehicle on the premises.

Additionally, both of the above-referenced policies require any deputy electing to impound or store a vehicle to complete a CHP 180 Form, "including an inventory of any personal property contained within the vehicle." (3-ER-347, 350).

12

At the time of the search, the following items of personal property were among the items contained in the truck:

a.  Two new pairs of Ray-Ban sunglasses, each with a value of about $150;
b.  An IPhone cord, with a value of about $10-20;
c.  An Android phone charger, with a value of about $10-20;
d.  A partially empty bottle of Sauvage cologne, in which the remaining amount of cologne had a value of about $30;
e.  A Nixon brand watch, with a value of about $175-200;
f.  A box of tools, with a collective value of about $50-75;
g.  An audio speaker, with a value of about $80; and
h.  Spare change.

(2-ER-185-185; 3-ER-295). None of these items were booked into evidence, listed on the CHP 180 Form, the police report, or any supplemental report.

### 3.  Summary of the Suppression Pleadings

Mr. Anderson moved to suppress any evidence related to the unlawful search of his truck because the deputies relied on the inventory search exception as a pretext to look for contraband, in violation of his Fourth Amendment rights. (2-ER-260-289). He first argued that the search was unlawful because there was no community caretaking reason to impound the car. (2-ER-273-278). The vehicle's location, parked in a private driveway, did not implicate any community caretaking function as it was not impeding traffic or at risk of theft. (*Id.*). To the extent that Mr. Anderson's car was in another person's driveway, Mr. Anderson had told the

13

deputies that the house belonged to a friend. (*Id.*). Therefore, there was no reason for the deputies to believe that the truck was impeding the community at the time that they searched it, it was simply parked at a friend's house for a visit like so many vehicles. (*Id.*),

Mr. Anderson also argued that the deputies could not rely on statutory authority to impound his truck because the deputies failed to comply with the statute. (2-ER-278-279). The CHP 180 Form listed California Vehicle Code § 22651(h) as the reason for impoundment, but § 22651(h) only permits impoundment pursuant to an arrest. (*Id.*). At the time the deputies searched the truck, they made it clear to Mr. Anderson that he was not under arrest. (*Id.*).

Mr. Anderson last argued that the inventory was not conducted properly in accordance with the intention underlying the inventory search exception and the relevant SBCSD policies. (2-ER-279-288). The CHP 180 Form did not list any of the many personal items contained in the truck, it just listed the contraband. (*Id.*). Thus, there would have been no way to insure the SBCSD against claims that these personal items were lost or stolen during the impoundment. (*Id.*). The deputies could not have intended to conduct an inventory search since they failed to produce an inventory. (*Id.*).

In its opposition, the government stated that the deputies were authorized to impound the truck pursuant to California Vehicle Code § 22651(p). (2-ER-236-

14

238). Section 22651(p) permits impoundment where the driver does not have a valid license, which the deputies had stated was their reason for towing the truck. (*Id.*).

The government next argued that the community caretaking doctrine also justified the impoundment because Mr. Anderson's truck was impeding Mr. Wallace's "access to his garage and full use of his driveway." (2-ER-238-241). The government also added that the truck, parked in a private driveway, was still subject to theft or vandalism in this high crime area. (*Id.*).

Importantly, the government did not try to argue that the deputies spoke to the homeowner before the search. (*Id.*). Instead, the government stated that the deputies were not required to confirm that the truck was parked without permission because the impoundment was permissible pursuant to § 22651(p) anyway. (*Id.*). Addressing the fact that Mr. Anderson offered to have a friend remove the car, the government argued that no law required the deputies to inquire into alternatives to impoundment. (*Id.*).

The government next argued that the flawed inventory search form still substantially complied with department policy, citing *United States v. Garay*, 938 F.3d 1108 (9th Cir. 2019). (2-ER-241-244). Specifically, the government noted that the deputies had taken photographs of the inside of the truck, checked boxes on the CHP 180 Form confirming that the truck had a radio, and circled places on a

15

drawing to indicate where the truck was damaged (also on the CHP 180 Form). (*Id.*). The tow truck driver had also signed and dated the form. (*Id.*).

Lastly, the government added that under *United States v. Johnson*, 889 F.3d 1120 (9th Cir. 2018), law enforcement can have a dual purpose, administrative and investigatory, in searching an individual's vehicle and that such dual purpose would not invalidate the search. (2-ER-244-247). Therefore, the extent that the deputies had an investigatory purpose, the government argued that they also had an administrative purpose for the search which they made explicit when they told Mr. Anderson that they were inventorying the truck before they towed it. (*Id.*).

The government attached declarations from Deputies Peterson and Schuler. (2-ER-248-257). In Deputy Peterson's declaration, he stated that Mr. Anderson had led him on a short high-speed chase at approximately 50 miles per hour, making several abrupt turns, and failed to yield for almost 30-45 seconds after Deputy Peterson activated his overhead lights. (2-ER-249-250). Deputy Peterson also claimed that Mr. Anderson shifted his weight to flee after exiting his truck and threw his keys on the ground. (*Id.*). Deputy Peterson also declared that Mr. Anderson did not comply with his orders after being confronted. (*Id.*).

According to both deputies' declarations, Deputy Schuler contacted the homeowner, Mr. Wallace, before the search began and confirmed he wanted the truck removed. (2-ER-252, 256). In Deputy Peterson's declaration, he said that

16

Deputy Schuler then turned around and gave him a thumbs up to proceed with the search. (2-ER-252). The "thumbs up" does not appear in Deputy Schuler's declaration anywhere. (2-ER-256). To explain the deficient inventory, Deputy Schuler declared that he only lists items of significant value on CHP 180 Forms. (2-ER- 256-257).

In response, Mr. Anderson noted that these declarations introduced several new and contradictory facts. (2-ER-168-182). The first set of inaccuracies involved Deputy Peterson's statement that Mr. Anderson led him on a short high-speed chase where Mr. Anderson failed to yield to the deputy's lights. (2-ER-172-174, 187-197, 217-222). Taken together, the facts underlying this claim had to be false given the length of the road, the natural turn of the road, and the speed at which Mr. Anderson was apparently travelling. (*Id.*). Specifically, the road naturally turned abruptly such that Mr. Anderson's turning so was not intentional. (*Id.*). Furthermore, if Mr. Anderson had been truly travelling as fast as the deputy claimed, it would have taken 15 seconds to complete the trip, not the 30-45 seconds that Deputy Peterson said it took before Mr. Anderson yielded to his activated lights. (*Id.*). Mr. Anderson also pointed out that Deputy Peterson never reported any of this to dispatch, instead stating that Mr. Anderson had "slowed, stop, and pulling into an apartment complex." (*Id.*) Additionally, Deputy Peterson's contemporaneous police report never indicated that Mr. Anderson failed

17

to yield or that he was travelling at a speed of 50 miles per hour in a 15 mile-per-hour zone, both vehicle code violations. (*Id.*).

Mr. Anderson also denied that he was attempting to flee after he was parked. (2-ER-177). For example, the Recording demonstrates that it would have been impossible for Deputy Peterson to have seen Mr. Anderson throw his keys before Deputy Peterson got out of the patrol vehicle. (*Id.*). One can hear keys dropping *after* Deputy Peterson had already confronted Mr. Anderson and asked him to drop the contents of his hands. (*Id.*).

The most important contradiction involved the deputies' purpose for impounding the vehicle. The deputies' both declared that Deputy Schuler spoke to the homeowner before they began to search. (2-ER-174, 176, 178-179). But the recorded evidence proved otherwise. (*Id.*). In the Recording, Deputy Schuler can be heard still talking to Mr. Anderson just before Mr. Anderson started objecting to the search. (*Id.*). Thus, the deputies could not have spoken to Mr. Wallace before they started searching the truck.

Additionally, the deputies failed to follow the statutory authority the government claimed in support of the impoundment. California Vehicle Code § 22651(p), states that law enforcement can only impound (and thus search) a vehicle **after** issuing the defendant with a Notice to Appear for driving without a

18

valid license. (2-ER-177-178). Yet, no such citation was issued before they searched the truck.

Mr. Anderson last put forward a declaration from his friend, Mercedes Vasquez, to demonstrate that she was available to remove the truck that night. (2-ER-186-85). She provided a photograph of her text messages showing that she was awake and texting at that time. (*Id.*). She also stated that she was located about twenty-eight minutes away from where Mr. Anderson had been stopped. (*Id.*). She also included a photograph of her driver's license which she used to pick up the truck, at which time she was able to see many of the personal items it contained. (*Id.*).

### 4.    **Summary of Hearing Testimony**

On July 27, 2020, the district court held a hearing on the motion to suppress. Deputies Peterson and Schuler testified, along with the homeowner, Mr. Wallace. (2-ER-39). Deputy Peterson testified first.

He confirmed that there were inconsistencies in his police report from the night of the incident and his later declaration. (2-ER-82-84). He repeatedly stated that the report was not necessarily in chronological order. (2-ER-74, 77-79, 82-84, 102-103). He acknowledged that there were additional facts in his declaration that he had not recorded in his police report, such as the thumbs up and high-speed chase. (2-ER-82-90). To explain this, on redirect, Deputy Peterson said that he

remembered more details about the incident later. (2-ER-102-104). However, he admitted that he never filed a supplemental report. (2-ER-106-107).

As for the lack of an inventory on the CHP 180 Form, Deputy Peterson implied that the photographs they took of the truck replaced a written inventory. (2-ER-94-95). However, he admitted that they did not photograph all areas of the car, including the center console and glove compartment. (2-ER-95-96). He also acknowledged that the department's policy manual does not state that a vehicle inventory can be done via photographs. (2-ER-112).

Deputy Peterson continued to insist that Mr. Anderson seemed to be trying to flee from him. (2-ER-97-101). He stated that when he told dispatch that the suspect had "slowed, stop, and pulling into an apartment complex," that was meant to indicate that the suspect was "slow to stop." (*Id.*). He persisted in testifying that Mr. Anderson was speeding, failed to yield when he activated his lights, threw his keys into the grass, and shifted his weight as if to flee. (*Id.*).

Deputy Schuler testified next mostly about the vehicle report he filled out. He testified that he did not see any items of value in Mr. Anderson's truck, but conceded that the department policy does not limit a deputies' inventorying responsibility to items of value. (2-ER-115-118). Defense counsel showed Deputy Schuler another CHP 180 Form that he had completed in a different case on December 19, 2019, where Deputy Schuler had noted that the car contained

20

speaker equipment and tools. (2-ER-118-124). Acknowledging that he did not do the same in Mr. Anderson's case, Deputy Schuler implied that the photographs of Mr. Anderson's truck documented its contents. (2-ER-120). He conceded, however, that he did not photograph several compartments of the truck, compartments that are his practice to search while doing an inventory. (2-ER-124, 126-127). In rebuttal, the government elicited the fact that Deputy Schuler did not see the tools or the watch, (2-ER-129), and that he detailed the condition of the truck on the CHP 180 Form. (2-ER-131-132).

The last witness was the homeowner, Michael Wallace. He testified that it took a few minutes from the time that he was awoken by knocks at the door until he opened his door. (2-ER-135). When he opened the door, he only spoke to one deputy for a few minutes and never saw that deputy gesture to anyone. (2-ER-136-137). He then went inside, spoke to his wife, and went back outside after his wife expressed some concerns that the individual was still at large on their property. (2-ER-137). The same deputy assured him that the individual was secured in a police car and that the truck would be towed. (*Id.*). A few weeks later, the same deputy who was at his door that night visited him to discuss the case and confirm he wanted the truck removed. (2-ER-138). Despite questioning by the government, Mr. Wallace maintained that he was certain that the deputy who discussed the case

with him weeks later (Peterson) was the same deputy who knocked on his door and spoke to him the night of the incident. (2-ER-139-141).

### 5. Summary of Hearing Arguments and Court's Decision

The parties proceeded to closing arguments that largely mirrored their moving papers. Mr. Anderson made one additional argument: he challenged the deputies' recollection about which one of them talked to the homeowner and whether the deputy at the door gestured to anyone. (2-ER-149-150). The government also added one argument: the government stated that the deputies did not need to provide Mr. Anderson with a citation or a Notice to Appear before searching the car under California Vehicle Code § 22651(p), just at some point before the vehicle was stored. (2-ER-157-158). The government offered no authority for this reading of the statute. The government also noted that Mr. Wallace would have requested that the truck be removed regardless of when the deputies spoke to him. (2-ER-159).

The following morning, the district court denied the motion:

> The Court is going to make the following findings on this matter.
>
> First of all, there's a lot of discrepancies and inconsistencies in the testimony. But judging the credibility and looking at what is speculative and what is the evidence that's before the Court, this Court's going to make the following findings.

22

> Number 1 is, the stop was made pursuant to a -- it was a legitimate stop for stopping someone whose license plate was obscured. There's no question on that. The defendant did not have a license. There's no question on that. The homeowner didn't want the car there. It wanted the car off the property. There's no question on that. The -- at that time the police have really an obligation to get the car off the property and impound the car. And pursuant to that, search the car. The search was proper.
>
> The only issue is maybe -- is the issue of whether or not they searched the car before or after they talked to the homeowner. The only evidence before the Court at this time, other than speculation, from the testimony of the witnesses, is that they did talk to the homeowner before they searched the car.
>
> And even if they didn't, then he has the doctrine of inevitable discovery that may play a part in this.
>
> But the Court is going to find that they did talk to the homeowner, searched the car and the search was proper. Therefore, the motion to exclude will be denied.

(1-ER-10-11). The court did not address any of the other contested facts, such as whether the deputies could rely on Mr. Anderson's violation of the vehicle code to impound, whether the deputies' failed to follow the vehicle code, whether Deputy Peterson was credible with respect to his testimony about Mr. Anderson's alleged flight, or whether the deputies' deviation from department policy in creating an inventory was material. Earlier in the hearing, the court seemed to believe that the details of what was inventoried was not relevant to the Fourth Amendment issue, just the credibility of the officers:

> Second of all, we're spending a huge amount of time on the inventory of the truck. The issue here is the search and seizure of the gun. The inventory was done afterwards, I'm assuming. I don't know why we're getting into the inventory, other than credibility.

(2-ER-127).

### 6.    Plea and Sentencing

After the district court denied the suppression motion, Mr. Anderson entered

a conditional guilty plea that preserved his right to appeal that denial. (2-ER-20-

36). The district court ultimately imposed a 77-month term of imprisonment, to be

followed by a three-year term of supervised release. (2-ER-16). As part of the

judgment, the district court ordered Mr. Anderson to comply with the following

standard condition of supervised release:

> 14. as directed by the probation officer, the defendant must notify specific persons and organizations of specific risks posed by the defendant to those persons and organizations and must permit the probation officer to confirm the defendant's compliance with such requirement and to make such notifications.[4]

(2-ER-18).  Mr. Anderson did not object to this condition.

---

[4] United States District Court for the Central District of California, General Order 20-04, *available at*:
https://www.cacd.uscourts.gov/sites/default/files/general-orders/GO%2020-04%20Second%20Amended.pdf (last visited April 12, 2021).

## V. SUMMARY OF ARGUMENT

Any evidence stemming from the unlawful search of Mr. Anderson's truck should have been suppressed. The deputies improperly relied on the inventory search exception as a pretext to rummage for criminal evidence after discovering that he had a criminal record. After all, it only took the deputies thirty-eight seconds to start searching Mr. Anderson's truck after dispatch reported that he was a career criminal.

As the facts above demonstrate, the parties debated several points, but the district court only addressed the community caretaking doctrine. The court found first that the deputies had spoken to the homeowner (the only community the deputies could possibly have been caring for) *before* they searched the truck. Since the homeowner did not want the truck there, the court found that the deputies had had an obligation to impound (and therefore search) the truck at that point. The district court also found that even if the deputies had not spoken to the homeowner until *after* searching the truck, the gun would still have been inevitably discovered.

Contrary to the district court's first finding, unassailable nonspeculative recorded evidence proves the deputies could not have spoken to Mr. Wallace prior to searching the truck. Therefore, there was no reason to believe that the truck was creating a hazard, impeding traffic or at risk of being vandalized. The district court also did not explain its second finding regarding the inevitable discovery doctrine.

25

Moreover, it was the government's burden to demonstrate that a second lawful search would have occurred, and they did not.

Regardless, no second lawful search could have occurred. Under California law, the deputies would have had to have determined if it was practical to move the truck first before impounding it. Mr. Anderson offered to have a friend come and remove the car. The deputies did not inquire into this friend's availability or location. Therefore, they could not have lawfully impounded the truck because they did not even attempt to determine if they could move it first.

The remaining issues in contention, which the court did not address, all supported granting the suppression motion. For example, the government's reliance on the fact that Mr. Anderson was driving on an expired license to justify the impoundment was wrong. It has been well-established in this Circuit that law enforcement cannot simply rely on a defendant's violation of the vehicle code to justify impounding and searching a vehicle under the Fourth Amendment. Moreover, the deputies here did not even comply with the statute's requirements.

Additionally, no inventory was created, in violation of SBCSD's policies. The Supreme Court has held that the scope of the inventory search must conform to the standard procedures of the local police department. *See Bertine*, 479 U.S. at 375. Yet the deputies did not perform the most basic task required by these policies — creating an inventory of the many personal items that were in the truck. The

26

deputies' failure to do so violated the very purpose behind the exception. In other words, there would have been no way for Mr. Anderson to protect his property or for SBCSD to insure itself against any property loss. More importantly, this failure proves that the deputies were not interested in inventorying the contents of the car. The circumstances here clearly demonstrate that the inventory search exception was used a pretext for a criminal investigation. This Court should reverse the district court's denial of Mr. Anderson's motion to suppress.

The district court also plainly erred by imposing an unconstitutionally vague condition of supervised release. In *United States v. Evans*, 883 F.3d 1154 (9th Cir. 2018), this court found a standard notification condition unconstitutionally vague, and it was modified accordingly. However, in *United States v. Magdirila*, 962 F.3d 1152 (9th Cir. 2020), this Court ruled that the modified notification condition, the same one imposed here, was still vague and remanded the case. 962 F.3d at 1158. This Court should do the same here.

## VI. ARGUMENT

A.  **The district court committed reversible error when it denied Mr. Anderson's suppression motion. The deputies used the inventory search exception to the warrant requirement as a pretext to rummage for evidence after they discovered that he had a criminal record. They were in the truck searching within minutes of stopping Mr. Anderson, without statutory authority or a community caretaking purpose to do so and they never inventoried the contents of the truck.**

### 1.  Legal Standards

This Court applies *de novo* review to "a district court's rulings on motions to suppress." *United States v. Barnes*, 895 F.3d 1194, 1199 (9th Cir. 2018) (internal quotation marks and citation omitted). The district court's "underlying factual findings" are reviewed for clear error. *United States v. Lara*, 815 F.3d 605, 608 (9th Cir. 2016).

Warrantless searches are *per se* unreasonable, unless the government can demonstrate that the warrantless search falls within an exception to the Fourth Amendment's warrant requirement. *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012). Consequently, [t]he government bears the burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement." *United States v. Job*, 871 F.3d 852, 860 (9th Cir. 2017).

Here, the district court upheld Deputy Peterson's search of Mr. Anderson's truck as a proper inventory search. As stated in the introduction, inventory searches are an exception to the warrant requirement because they are conducted for routine

administrative and non-investigatory purpose — creating an inventory. *See Bertine*, 479 U.S. at 371; *see also Camara v. Mun. Court of City & Cty. of San Francisco*, 387 U.S. 523, 537 (1967). To ensure that law enforcement does not misuse the inventory search process for criminal investigations, courts have articulated certain requirements for an inventory search to be valid: (1) the individual officer's decision to impound a vehicle must be for a valid community caretaking function, and (2) the subsequent inventory itself must be conducted in accordance with the department's standardized policies and procedures. *See Bertine*, 479 U.S. at 375 (inventory search must be conducted "according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity"); *Cervantes*,703 F.3d at 1141 ("Once a vehicle has been legally impounded, the police may conduct an inventory search, as long as it conforms to the standard procedures of the local police department."). For both requirements, courts look to local laws and departmental guidance to establish the conditions for impoundment and procedures for an inventory search. *Id*; *see also Miranda v. City of Cornelius*, 429 F.3d 858, 866 (9th Cir. 2005) ("The decision to impound must be guided by conditions which 'circumscribe the discretion of individual officers' in a way that furthers the caretaking purpose.") (quoting *Bertine*, 479 U.S. at 376 n.7)).

Here, the government argued that the deputies were justified under statutory authority in impounding and searching Mr. Anderson's truck based on the fact that

he was driving on an expired license, a violation of the state vehicle code. *See* CA Veh. Code § 22651(p). However, as will be argued below, this is insufficient under the law.

> **2. The deputies' reliance on the fact that Mr. Anderson was driving unlicensed as a reason to impound and search Mr. Anderson's car was insufficient on its own. The deputies needed a community caretaking reason to impound the vehicle.**

This Court has repeatedly held that that a violation of a state statute is not sufficient, on its own, to justify the search and seizure of a vehicle under the inventory search exception. Law enforcement must have a community caretaking purpose for removing the car before they can search it to safeguard its contents.

For example, in *Miranda v. City of Cornelius*, this Court found "that the decision to impound pursuant to the authority of a city ordinance and state statute does not, in and of itself, determine the reasonableness of the seizure under the Fourth Amendment, as applied to the states by the Fourteenth Amendment." 429 F.3d at 864-65. The reasonableness of an impoundment, within the meaning of the Fourth Amendment, depended on both "if the driver's violation of a vehicle regulation prevents the driver from lawfully operating the vehicle, **and also** if it is necessary to remove the vehicle from an exposed or public location." *Id*. (Emphasis added).

In *Cervantes*, this Court again found that citing to a violation of the California Vehicle Code was insufficient, on its own, to justify impounding and searching a vehicle. 703 F.3d at 1141-1142. The Court reiterated that "'a valid caretaking purpose' is required." *Id*. California courts have also found that statutory authority is insufficient on its own. *People v. Williams*, 145 Cal.App.4th 756, 763 (Cal. App. 2006) ("Clearly, *Bertine* does not validate any impoundment that falls within Vehicle Code section 22651. The impoundment must still serve a community caretaking function.").

The deputies could not rely on the fact that Mr. Anderson was driving on an expired license alone to justify impoundment. Even if they could, the deputies here failed to follow the very statute that they cited. *See Cervantes*, 703 F.3d at 1142-1143 (finding that statutory authority is insufficient to justify impoundment on its own, and noting that the officers failed to comply with the vehicle code they cited anyway because the defendant was not arrested until after the contraband was discovered). Here, the deputies relied on two provisions, Cal. Veh. Code § 22651(p) and (h). Section 22651(p) required the deputies to have issued Mr. Anderson a Notice to Appear for the vehicle code violation before searching his truck, and they did not. Section 22651(h) required the deputies to have arrested Mr. Anderson before searching, but, again, they did not. On the Recording, the deputies can be heard telling Mr. Anderson that he is not under arrest minutes before they

31

call in the gun's serial number. (3-ER-309); *see infra* chart section IV.A.3, pages 33-35.

The deputies also failed to follow SBCSD impound policies which were established to "assist [an] officer in making his decision [to store or impound a vehicle]." (3-SER-346). The SBCSD policy manual lays out a few situation where storing or impounding a vehicle would be appropriate, none of which occurred here. (3-SER-347, 350). The vehicle was not abandoned, a traffic hazard, stolen, or in an accident. (*Id*.). The only possibly relevant provision accounts for what an officer should do when "an arrest is made" assuming the deputies intended to arrest Mr. Anderson for driving on an expired license (even though they never did). (3-ER-347). It states that an officer may store a vehicle "when an arrest is made, and the driver refuses to leave the vehicle at the scene." (*Id*.). However, neither deputy asked Mr. Anderson if he was willing to leave the truck parked at the scene.

In summary, the state vehicle code section the deputies relied on to impound and search Mr. Anderson's truck cannot, on its own, support the Fourth Amendment violation here. The deputies needed a community caretaking reason to remove the truck before they could search it. The deputies also failed to follow the statutory authority they cited, and SBCSD policies, further demonstrating that they were only relying on this authority as a pretext to search Mr. Anderson's truck for criminal evidence.

> **3.** **There was no community caretaking reason apparent at the time the deputies conducted the search. The deputies did not speak to the homeowner to ascertain whether the truck was blocking his driveway before they searched and found the gun. The district court's finding to the contrary was clearly erroneous based on unassailable nonspeculative recorded evidence.**

The deputies had no reason to impound Mr. Anderson's truck in their community caretaking function at the time that they searched it. The district court's conclusion to the contrary was clearly erroneous. At the conclusion of the hearing, the district court made a few brief findings. It found that the stop was legitimate because Mr. Anderson was driving with an obstructed license plate, his license was expired, and the homeowner did not want the truck on his property. (1-ER-10-11). From this, the district court held that the search was "proper" because the deputies had an obligation to "impound the car," and "[p]ursuant to that, search the car." (*Id.*). The district court acknowledged that there was some debate as to when the deputies discovered that the homeowner did not want the truck on his property, before or after they searched the truck. (*Id.*). However, the court held that "[t]he only evidence before the Court at this time, other than speculation, from the testimony of the witnesses, is that they did talk to the homeowner before they searched the car." (*Id.*).

This finding was clearly erroneous because the district court had ample nonspeculative evidence that told a different story — the Recording, which is a

33

real-time record of the events at the scene, and the Log, which provides a timestamp for when Deputy Peterson called in certain events to dispatch. (3-ER-300-312; Exs. 1A). From the following chart, lining up the Log and the Recording, Deputy Schuler (the deputy who allegedly spoke to the homeowner before the search) can be heard constantly speaking to Mr. Anderson from the time he arrives at 2:03:48 a.m., until Mr. Anderson asks them why they are searching his truck at 2:06:22 in the morning:

| **Audio Recording at Scene**<br>(Ex. 1A for Audio, Ex. 1B for Transcript) | **Dispatch Log**<br>(Ex. 2) |
|---|---|
| | 2:01:56 a.m.<br> - Inquiry for License Plate 46890N1 |
| | 2:02:10 a.m.<br> - "04 Chevy" |
| 00:00 minutes<br> - Deputy Peterson initiates contact | |
| 00:28 minutes<br> - Deputy Peterson says "26 Paul 11 one at gunpoint" | 2:02:57 a.m.<br> - "At Gunpoint" |
| 01:19 minutes<br> - **Deputy Schuler arrives saying,** "You got me" | **\*\*This occurred at 2:03:48 a.m. - adding 51 seconds from when they report that he is at gunpoint (the duration was calculated from the column to the left)** |
| 01:51 minutes<br> - Deputy Peterson says "26 Paul 11 one detained" | 2:04:05 a.m.<br> - "One detained" |

34

| | |
|---|---|
| 01:56 minutes<br>- **<u>Deputy Schuler asks</u>** Mr. Anderson if he has anything that is going to "stick him or poke him."<br><br>2:17 minutes<br>- Deputy Peterson asks "who's house is this" and Mr. Anderson answers "just a friend."<br><br>2:32-2:33 minutes<br>- Deputy Peterson says "26 Paul 11 - clear for one"<br><br>2:34 minutes<br>- Mr. Anderson offers that he does not have a current driver's license<br><br><br>2:36 - 2:37 minutes<br>- **<u>Deputy Schuler asks</u>** "its suspended?" He says "just expired" | |
| 2:38-2:45 minutes<br>- Deputy Peterson says "Can you confirm WNA, last of Anderson, First of Jonathan, 04/02/86, 86." | 2:04:48 a.m.<br>- "Inquiry Name, Anderson, Jonathan M 04/02/1986." |
| 2:45 minutes<br>- **<u>Deputy Schuler says</u>** "that's a lot of money dude" after going through his wallet<br>3:41 minutes<br>- **<u>Deputy Schuler asks</u>** "what's up with the gloves" | - |
| | 2:05:36 a.m.<br>- "Career Criminal" |

35

| | |
|---|---|
| 04:08  minutes<br>- Mr. Anderson say "Sir, you can't check my truck, why can you check my truck?" | **This occurred at 2:06:22 a.m. - adding 2 minutes and 17 seconds from the time that Mr. Anderson was detained (the duration was calculated from the column to the left) |
| 04:10<br>- **Deputy Schuler states** "you don't have a valid license, we are going to tow your truck….This is an inventory."<br><br>04:21<br>- Mr. Anderson asks if a friend can come and get his car<br><br>04:22<br>- **Deputy Schuler says** "no" | **This occurred at 2:06:36 a.m. - adding 2 minutes and 36 seconds from the time that Mr. Anderson was detained (duration calculated from the column to the left) |
| 05:00<br>- Deputy Peterson stops recording, turning the equipment on later when obtaining Mr. Anderson's *Miranda* waiver (Ex. 19A-B) | **This occurred at 2:07:14 a.m. - adding 38 seconds from the time that Deputy Schuler says no above (duration calculated from the column to the left) |
| | 2:08:46 a.m.<br>"Inquiry Gun" |

To the extent that the government would argue that the deputies paused their search, talked to Mr. Wallace, and then resumed their searching before they found the gun, that is also impossible based on these recordings. As charted above, Deputy Schuler is last heard on the Recording at 2:06:36 a.m. and Deputy Peterson

called in the gun's serial number to the dispatcher at 2:08:46 in the morning. At most, Deputy Schuler had one minute and 50 seconds of time to decide to speak to the homeowner, walk up to the home, knock on the door, wake up Mr. Wallace, talk to him, tell him what happened, find out if he knew Mr. Anderson, and alert Deputy Peterson to resume searching the truck. Also during that one minute and fifty seconds, Deputy Peterson would have to have resumed his search, found the gun, located the serial number, read it at night, and called it in. [5] In other words, it is simply not possible that the deputies spoke to Mr. Wallace before they found the gun, based solely on the unassailable evidence contained within the Recording and Log.

There were other reasons to doubt the deputies' declarations and testimony about when they spoke to the homeowner. The homeowner, Mr. Wallace, testified that it took at least a minute or two for him to fully wake up and answer the door after he heard the knocking at 2:00 in the morning, and that the conversation lasted several minutes. (2-ER-135). This would have consumed all of the time between the last time Deputy Schuler is heard on the Recording and when Deputy Peterson

---

[5] In actuality, Deputy Schuler had even less time as he can be heard in the background after his last audible statement just before the Recording is suspiciously shut off at 2:07:14 in the morning. (Ex. 1A at 4:22-5:00). Since the gun was called in at 2:08:46, that leaves Deputy Schuler with only one minute and thirty-two seconds for the above-discussed sequence of events to have happened.

called in the gun's serial number. Additionally, Deputy Peterson testified (and wrote in his declaration) that Deputy Schuler turned around and gave him a "thumbs up" gesture to signify that he could search the truck. (2-ER-84, 251). But Deputy Schuler did not testify to this or have this fact in his declaration, (2-ER-255-257), and Mr. Wallace never saw the deputy at the door gesture to anyone else. (2-ER-136). Lastly, the deputies stated that it was Deputy Schuler who talked to the homeowner. (2-ER-252, 256). Mr. Wallace, however, was adamant that it was Deputy Peterson who spoke to him at the door of his house that night. (2-ER-138-141).

Moreover, it should not matter if the deputies paused their search to speak to the homeowner. The fact that the deputies launched into the truck without first confirming whether or not it was legally parked demonstrates that their intention was investigatory and not administrative. They simply could not have believed that they could tow a vehicle driven by an unlicensed driver or a vehicle legally parked in a private driveway. The SBCSD policy manual itself contains guidance that tells deputies to leave a vehicle that is legally parked when arresting a driver for driving under the influence (far worse than driving on an expired license). (3-SER-346).

In summary, the evidence clearly shows that the deputies were covering for what they knew to be an improper search when they spoke to Mr. Wallace after the search was completed, and declared that they had done so before. If the deputies

were truly trying to care for the community when they searched Mr. Anderson's truck, they would have spoken to the homeowner immediately. They did not. The district court's finding to the contrary is clearly erroneous based on the record.

### 4. The inevitable discovery doctrine is inapplicable here, the government cannot, and did not even try to, carry its burden of proving that a second lawful search would have occurred.

The district court seemed to rule in the alternative that the inevitable discovery doctrine "may play a part in this," even if the deputies did not speak to the homeowner until after they searched the truck. (1-ER-10-11). The district court failed to provide any explanation as to how this legal doctrine would apply under the facts of this case. (*Id*.). Moreover, it was the government's burden to prove that the inevitable discovery doctrine applied, and the government never opposed Mr. Anderson's motion under this theory. (2-ER-225-247).

The inevitable discovery doctrine permits the government to rely on evidence that was uncovered through unlawful means if it ultimately would have been discovered through other, lawful means. *See United States v. Ruckes*, 586 F.3d 713, 718 (9th Cir. 2009); *United States v. Andrade*, 784 F.2d 1431, 1433 (9th Cir.1986); *Nix v. Williams*, 467 U.S. 431, 443 (1984). As the Supreme Court has explained, "[t]he inevitable discovery doctrine . . . is in reality an extrapolation from the independent source doctrine: Since the tainted evidence would be admissible if in fact discovered through an independent source, it should be

39

admissible if it inevitably would have been discovered." *Murray v. United States*, 487 U.S. 533, 539 (1988). Before a court can apply the inevitable discovery doctrine, the government must "prove, by a preponderance of the evidence, that there was a lawful alternative justification for discovering the evidence." *Ruckes*, 586 F.3d at 718. Importantly, "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *Id.* at 719 (quoting *Nix*, 467 U.S. at 444 n. 5) (emphasis added).

Here, it was not inevitable that another lawful search would have occurred. A deputies' decision to impound a vehicle must also follow local laws and department policies. *United States v. Torres*, 828 F.3d 1113, 1118 (9th Cir. 2016) (citing *Cervantes*, 703 F.3d at 1141). At the time that Mr. Anderson's truck was searched, the only plausible community caretaking reason that the deputies could have relied on for impounding it was that it was blocking a private driveway. The California Vehicle Code provides law enforcement with guidance and procedures to follow in just such a scenario.[6] *See People v. Williams*, 145 Cal.App.4th 756, 763 (Cal. App. 2006) ("Impoundment must still serve a community caretaking function. At best, the statute [22651] may constitute a standardized policy guiding

---

[6] The SBCSD also issued policies guiding the deputies' discretion about when to impound or store a vehicle, which, as already argued, the deputies failed to follow. *See supra* page 30-31, 37.

officers' discretion."). Section 22651(d) states that peace officers can remove a vehicle when that "vehicle is illegally parked so as to block the entrance to a private driveway **and it is impractical to move the vehicle** from in front of the driveway to another point on the highway." Cal. Veh. Code § 22651(d) (Emphasis added). Therefore, the deputies would have had to have determined that it was impractical to move the truck before impounding it.

But they did not, even when they were presented with a practical option to move the truck — Mr. Anderson's friend Mercedes Vasquez. Yet, the deputies did not inquire into the availability of the friend or ask Mr. Anderson to contact her. (3-ER-308). Had they done so, they would have learned that Mr. Anderson's friend was awake, within a 28-minute drive of the location, and had a valid driver's license. (2-ER-185, 213-214). Mr. Anderson offered to have his friend come get the truck around 2:06 in the morning, so she would have been able to retrieve it long before it was towed at 3:03 in the morning. (3-ER-359). In other words, it would not only have been practical to rely on Mr. Anderson's friend to move the truck – it would have been faster.

Mr. Anderson recognizes that the reasonableness of an impoundment does not "necessarily …turn on the existence of alternative 'less intrusive' means.'" *Bertine*, 479 U.S. at 374 (quoting *Illinois v. Lafayette*, 462 U.S. 640, 647 (1983)). But what does it mean when an officer does not comply with a state law requiring

41

them to inquire into alternatives before impoundment? This Court answered that question in *United States v. Maddox*, where it invalidated an inventory search under the Fourth amendment because it was not conducted "in accordance with the standard procedures of the Washington State Patrol." 614 F.3d 1046, 1049 (9th Cir. 2010) (citing *United States v. Wanless*, 882 F.2d 1459, 1463 (9th Cir. 1989)). The Washington state statute at issue in *Maddox* permitted officers to remove a vehicle in their community caretaking function "[provided] neither the defendant nor his spouse or friends are available to move the vehicle." *Id*. The panel found that because "Maddox offered to have his friend move the vehicle, the officer did not sufficiently consider alternatives before impounding Maddox's truck." *Id*.

The statute at issue here similarly required the deputies to inquire into the practicality of moving the truck as it was blocking Mr. Wallace's access to his driveway. But when Mr. Anderson offered a means of moving his truck, the deputies failed to consider it. Therefore, under these facts, the government cannot demonstrate that another **lawful** search would have inevitably occurred.

A requirement that officers not disregard an offered alternative to impoundment makes sense, as this Court has already found. *See Miranda*, 429 F.3d

at 865[7] (citing *United States v. Duguay*, 93 F.3d 346, 352 (7th Cir. 1996)) ("'The policy of impounding the car without regard to whether the defendant can provide for its removal is patently unreasonable if the ostensible purpose for impoundment is for the 'caretaking' of the streets.'"). In this situation, the only member of the community who needs care is the homeowner whose driveway is affected. There is no immediate threat to public safety or the flow of traffic. There is no risk of vandalism or theft. There are any number of reasons why a car may be blocking a driveway.[8] It may even be a mistake as it was here. Therefore, law enforcement cannot be permitted to ignore the availability of a licensed driver and proceed to impound any so-parked car.

---

[7] Although the issue in *Miranda* was the impoundment of a car driven by an unlicensed driver that was parked in the driver's own driveway, the same principles should apply here.

[8] For example, a person might choose to pull into a private driveway during a traffic stop simply because it is well-lit, just as Mr. Wallace's driveway was in this case. (2-ER-205; Ex. 26B at 5:02-5:20). It is common for individuals to drive until they can stop in a well-lit area when confronted with police. *See* Tom Forman, Assoc. Press, *Army Lieutenant Sues Police for Pepper Spraying, Threatening Him During Stop*, ARMY NEWS (April 10, 2021) https://tinyurl.com/37baz8p6 (officer admitting that the army officer's decision to drive to a lighted area after being pulled over happens to him "a lot, and 80% of the time, it's a minority."); *see also* Krista Doyle, *What are Your Rights when You get pulled Over?*, ACEABLE, https://tinyurl.com/8reccz77, (last visited April 27, 2021).

Permitting an inventory search to be conducted under these circumstances would expand this exception to swallow any protections remaining for vehicles under the Fourth Amendment. Law enforcement can justify towing vehicles parked on curbsides for traffic reasons, *see United States v. Moore*, 655 Fed. Appx. 531 (9th Cir. 2016), public lots for vandalism, *see Ramirez v. City of Buena Park*, 560 F.3d 1012, 1025 (9th Cir. 2009), and now vehicles on private property can be towed even when an individual is available to move the car faster than a tow truck can.

It is evident from this record that the deputies were not interested in caring for the community when they decided to tow the truck and inventory it. Even if they had an after-the-fact-created community caretaking reason to justify the towing, they still would have had to have followed certain procedures as outlined in the statute and in the SCBSD's policies. Because they failed to do so, it is not inevitable that a second lawful search would have occurred.

**5. The actual search demonstrates that the deputies had an impermissible investigatory purpose because they failed to accomplish the most basic purpose of an inventory search according to SBCSD policies: producing an inventory.**

The deputies' alleged inventory search did not comport with the very purpose underlying the existence of the exception — to "produce an inventory" of property items to protect those items and insure the SBCSD from claims of loss. *Wells*, 495 U.S. at 4. Here, the deputies did not list several personal items on the

44

CHP Form, including: a large speaker, a bag of tools, a bottle of cologne, expensive sunglasses and an expensive watch. (2-ER-185-186, 295; 3-ER-359).[9] The incomplete inventory was also a violation of the SBCSD's inventory policies which require deputies to list "include an inventory of **any personal property** contained within the vehicle" on a CHP 180 Form. (3-ER-347, 350) (emphasis added).

The search was therefore unreasonable under the Fourth Amendment. The Supreme Court has held that a purported inventory search that is conducted without standardized procedures or practices is not constitutionally reasonable. *Id*. 49 U.S. at 4-5; *see also Bertine*, 479 U.S. at 375; *United States v. Hellman*, 556 F.2d 442, 444 (9th Cir. 1977). Thus, this Court has found that purported inventory searches that fail to follow standardized procedures similarly cannot be constitutionally reasonable. *See e.g., United States v. Caseres*, 533 F.3d 1064, 1074 (9th Cir. 2008) ("warrantless inventory searches of vehicles are lawful only if conducted pursuant to standard police procedures that are aimed at protecting the owner's property and at protecting the police from the owner charging them with

---

[9] The district court made no ruling about the deputies' compliance with the inventory policy. (1-ER-10-11). Based on the hearing transcript, the district court appeared to believe that any testimony regarding the deputies' compliance the department's inventory policy was only relevant for purposes of credibility. (2-ER 127).

having stolen, lost, or damaged his property"); *see also Wanless*, 882 F.2d at 1464 ("the federal law on inventory searches by state or local police officers is that they must be conducted in accordance with the official procedures of the relevant state or local police department" (emphasis omitted)). After all, standardized procedures that are ignored can hardly serve their function of limiting inventory searches to the permissible, noncriminal purpose of protecting the property contained within the vehicle. *See e.g., Magdirila*, 962 F.3d at 1159 (9th Cir. 2020) (Berzon, J., dissenting) ("Where no inventory at all is produced, the property protection, insurance, and danger reasons for the exception all go up in smoke.").

To explain why Mr. Anderson's personal property was missing from the CHP 180 Form, Deputy Schuler declared that he only listed things of significant value and did not find any such items in Mr. Anderson's truck. (2-ER-256-257). However, as he admitted during testimony, the SBCSD's inventory policy does not limit a deputy to listing only items of value. (2-ER-117). Deputy Schuler further testified that this policy makes sense because an officer cannot always tell what is valuable. (2-ER-118). Interestingly, Deputy Schuler admitted to having listed similar property (a speaker and tools) on a CHP Form filed in another case. (2-ER-119-120, 122). As such, this excuse rings false.

Another explanation the deputies provided was that the photographs of the truck were a sufficient inventory, (2-ER-94-95, 120). Yet the department's policy

46

manual does not indicate that photographs can be used to create an inventory. Again, this makes sense, as items could be hidden underneath other items or in other compartments in a vehicle and would not be captured in a photograph. For example, in this case, none of the photographs reveal the tools, the cologne, the watch, or the sunglasses, which were in compartments Deputy Schuler admitted he did not photograph. (2-ER-124-126). How, then, could these photographs be used to demonstrate what precise items were in each compartment of the truck to insure the department against claims of lost items or to protect Mr. Anderson's property?

Relying on this Court's holding in *Garay*, 938 F.3d at 1110-112, the government below argued that the deputies' failure to complete an inventory form does not invalidate their search because it was not a material deviation from the department's inventory policy. (2-ER-242-243). However, this expansive holding in *Garay* contravenes long-standing Supreme Court caselaw. *See Wells*, 495 U.S. at 4 ("[s]tandardized criteria…must regulate the opening of containers found during inventory searches…The policy or practice governing inventory searches should be designed to produce an inventory."); *Bertine*, 479 U.S. at 372 ("our cases [have] accorded deference to police caretaking procedures designed to secure and protect vehicles and their contents within police custody."). The holding in *Garay* also undermines the entire purpose behind the inventory search exception, which is to protect the property contained within the vehicle. *See Magdirila,* 962 F.3d at

1159-60 (Berzon J., dissenting) (finding that *Garay* was wrongly decided based on the purpose for an inventory search exception). California courts have similarly recognized that an officer's failure to take a meaningful inventory can demonstrate that a purported inventory search was pretextual. *Williams*, 20 Cal. 4th at 138 ("If [the deputies] truly intended to take an inventory pursuant to a preexisting policy or practice rather than to search for drugs, why did they fail to complete the inventory?").

Notwithstanding that it was wrongly decided, *Garay* is also distinguishable. The panel in *Garay* thrice-noted that the officers booked into evidence all of the property found in the destroyed vehicle. *Garay*, 938 F.3d at 1110-1112. The panel also highlighted that the officers wrote on the CHP Form that the vehicle contained numerous personal items. *Id*. Therefore, although they did not produce a written list of the items, the officers still, ultimately protected the property from theft or loss. In another case relying on *Garay*, the officers similarly listed some of the property on the CHP 180 Form and some on the police report, which was cross-referenced on the CHP Form. *Magdirila*, 962 F.3d at 1158. In other words, in both cases the officers safeguarded the personal items that were in the vehicles, either through a list on some report or by booking the items into evidence.

The same is not true here. Deputies Peterson and Schuler did not safeguard, or create any reliable record of, the items contained in Mr. Anderson's truck. The

deputies' failure was thus a material deviation from the department's inventory policy and a violation of the entire purpose behind the inventory search exception.

### 6. The deputies' intent was to search the car and rummage for criminal evidence.

From all the facts above, the deputies' clear intent in searching the vehicle was investigatory as opposed to administrative. To prevent inventory searches from being used as pretext for criminal investigations, a court "must inquire into an officer's purpose" when presented with objective evidence suggesting that the intrusion was not made for an administrative purpose. *Johnson*, 889 F.3d at 1125-26. Thus, unlike most Fourth Amendment law, the deputies' intent matters in the context of inventory searches. *See id.* ("explaining that despite the usual rule that an officer's subjective intent plays no rule in a Fourth Amendment inquiry, when the government seeks to justify a search as an inventory or other administrative search, "actual motivations do matter.") (quoting *United States v. Orozco*, 858 F.3d 1204, 1210 (9th Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011))). While "the mere 'presence of a criminal investigatory motive' or a 'dual motive—one valid, and one impermissible—'does not render an administrative stop or search invalid," if the actual challenged search would not have occurred but for the impermissible criminal investigatory motive, then the search cannot be justified as an inventory search. *Id.* at 1126 (quoting *Orozco*, 858 F.3d at 1213).

49

Ample evidence suggests that the deputies' sole intent was to impermissibly rummage for criminal evidence:

- The deputies did not go into Mr. Anderson's truck until they learned that Mr. Anderson was a career criminal, and went in very quickly after they learned that fact. (*See supra* chart in section IV.A.3).

- The deputies made several comments indicating that they were suspicious of Mr. Anderson. (3-ER-306-307). For example, they questioned the amount of money he had on him and the reason he carried gloves, indicators of marijuana growers.

- The deputies were not interested in the original reason for the stop as they never mentioned the obstructed license plate, nor did they issue Mr. Anderson a citation for driving on an expired license. (3-ER-300-309).

- When Mr. Anderson offered to have a friend come and get his car, the deputies did not seem interested in even ascertaining if this was a reasonable alternative to towing. (3-ER-308). Nor did the deputies ask Mr. Anderson if he wanted to leave his car at the location in compliance with department policy. (3-ER-300-309).

- The deputies did not speak to the homeowner before they began searching the truck. (*See supra* section IV.A.3).

50

- Most importantly, the deputies did not even create an actual inventory of the items in Mr. Anderson's car. (3-ER-359).

Against the weight of this evidence, the government relied on the deputies' statements from that night, indicating that they were inventorying Mr. Anderson's truck because of his expired license, to demonstrate that deputies had an administrative purpose. (2-ER-246-247). However, as has been noted above, no department policy or local law authorized the deputies to just immediately start rummaging through a vehicle driven by an unlicensed driver. (3-ER-342-352); CA. Veh. Code § 22651(p).[10] So, the deputies, in fact, had no valid authority to impound the truck as they did.

The deputies' statements were, therefore, merely convenient justifications for their illegal actions. The surrounding circumstances demonstrate that the deputies' sole motive was investigatory. Had the deputies been at all interested in validly impounding the truck for a community caretaking function, they would

---

[10] Again, the only relevant section of the SBCSD's policy manual states that a deputy sheriff can store a vehicle when an arrest is made, and the driver refuses to leave the vehicle at the scene. (3-ER-347). Yet, Mr. Anderson was not arrested until after the gun was found, (3-ER-309), nor did the deputies ask him if he was willing to leave his vehicle there. California law permits law enforcement to remove the vehicle of an unlicensed driver only after issuing a Notice to Appear to the unlicensed driver for the violation of the vehicle code. See CA. Veh. Code § 22651(p). The fact that neither deputy issued Mr. Anderson with any such citation only supports the idea that they were not interested in Mr. Anderson's violation of the vehicle code.

51

have, at least, spoken to the homeowner before they started their search. They would have cited him for the vehicle code violations, called a tow truck, and listed the items in Mr. Anderson's truck. Because their purpose was so clearly impermissible, the district court's denial of Mr. Anderson's suppression motion must be reversed.

**B.    The district court committed plain error when it imposed a notification condition that is just as unconstitutionally vague as the notification conditions struck down in *United States v. Evans*, 883 F.3d 1154 (9th Cir. 2018).**

**1.    Standard of Review**

This Court generally reviews a district court's decision to impose a particular condition of supervised release for abuse of discretion, but reviews de novo whether a condition violates the Constitution. *Evans*, 883 F.3d at 1159. When trial counsel fails to object to a condition of supervision, review shifts to plain error. *See United States v. Wolf Child*, 699 F.3d 1082, 1089 (9th Cir. 2012).

**2.    As this Court has already found, the reformulated Standard Condition 14 is still unconstitutionally vague.**

In *United States v. Evans*, 883 F.3d 1154 (9th Cir. 2018), this Court considered and found unconstitutionally vague a then-standard notification condition requiring:

> As directed by the probation officer the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics.

*See id.* at 1163; *see also* General Order No. 05-02.  The Central District modified its standard conditions, and in this case, the district court imposed the following modified standard supervised release condition no. 14.:

> As directed by the probation officer, the defendant must notify specific persons and organizations of specific risks posed by the defendant to those persons and organizations and must permit the probation officer to confirm the defendant's compliance with such requirement and to make such notifications[.]

(2-ER-18).  Recently, in *United States v. Magdirila*, 962 F.3d 1152, 1158-59 (9th Cir. 2020), this Court found that this condition still suffers from some of the same deficiencies which motivated this Court to strike down its predecessor in *Evans*. Specifically, in *Magdirila*, this Court found that this condition still "failed to answer the question of what conduct the defendant needed to warn the public about." *Id.*

Although Mr. Anderson did not object to the notification conditions below, that should not preclude him from relief. This Court is not bound by the plain error standard where "the appeal presents a pure question of law and there is no prejudice to the opposing party that resulted from the defendant's failure to object." *United States v. Joseph*, 716 F.3d 1273, 1276 n.4 (9th Cir. 2013) (internal quotation marks omitted). Here, the unconstitutionality of the notification condition involves pure question of law that was already resolved in *Magdirila*.

53

The defense in *Magdirila* failed to object, but this Court still remanded the case. The same result should apply here.

In any event, Mr. Anderson can satisfy the plain-error standard because the district court erred, that error was plain, the error affected Mr. Anderson's substantial rights, and the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Joseph*, 716 F.3d at 1277. There can be no doubt that the error is plain based on *Evans* and *Magdirila.* This error also affects Mr. Anderson's substantial rights and seriously affects the fairness, integrity, or public reputation of judicial proceedings because the condition cannot be lawfully imposed. S*ee United States v. LaCoste*, 821 F.3d 1187, 1192 (9th Cir. 2016) (third and fourth prongs of plain-error standard satisfied where Internet-use restriction could not lawfully be imposed).

This Court has recognized that "there is little reason not to correct plain sentencing errors when doing so is so simple a task. Reversing a sentence does not require that a defendant be released or retried, but simply allows a district court to exercise properly its authority to impose a legally appropriate sentence." *Joseph*, 716 F.3d at 1281 (internal quotation marks omitted). Under the circumstances, a remand for the district court to correct the unconstitutional conditions is necessary and appropriate.

54

## VII. CONCLUSION

For the reasons stated above, Mr. Anderson respectfully requests that this Court reverse the district court's denial of his suppression motion and vacate his conviction.  If the Court does not do so, Mr. Anderson respectfully requests that it vacate his sentence and remand to correct his illegal conditions of supervised release.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: May 18, 2021         By  */s/ Ashwini Mate*
                               ASHWINI MATE
                               Deputy Federal Public Defender
                               Attorney for Defendant-Appellant

## INDEX OF ADDENDUM

U.S. CONST. AMEND. IV ................................................................................. A-1

CA. VEH. CODE § 22651 ................................................................................. A-2

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** _____20-50345_____

The undersigned attorney or self-represented party states the following:

[ X ]  I am unaware of any related cases currently pending in this court.

[  ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[  ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** _____s/Ashwini S. Mate_____ **Date** ___5/18/2021_____
*(use "s/[typed name]" to sign electronically-filed documents)*

57

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** _____20-50345_____

I am the attorney or self-represented party.

**This brief contains \_\_13,000\_\_\_ words,** excluding the items exempted by

Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App.

P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties;
    [  ] a party or parties are filing a single brief in response to multiple briefs; or
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _____*s/Ashwini S. Mate*_____ **Date** \_\_5/18/2021 _____
*(use "s/[typed name]" to sign electronically-filed documents)*

58

Amendment IV. Searches and Seizures; Warrants, USCA CONST Amend. IV-Search...

Case: 20-50345, 05/18/2021, ID: 12116697, DktEntry: 12, Page 67 of 74

United States Code Annotated
   Constitution of the United States
      Annotated
         Amendment IV. Searches and Seizures; Warrants

A-1

U.S.C.A. Const. Amend. IV-Search and Seizure; Warrants

Amendment IV. Searches and Seizures; Warrants

Currentness

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

<Historical notes and references are included in the full text document for this amendment.>

<For Notes of Decisions, see separate documents for this amendment.>

U.S.C.A. Const. Amend. IV-Search and Seizure; Warrants, USCA CONST Amend. IV-Search and Seizure; Warrants
Current through PL 117-12 with the exception of PL 116-283. Incorporation of changes from PL 116-283 are in progress. See credits for details.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

A-2

West's Annotated California Codes
  Vehicle Code (Refs & Annos)
    Division 11. Rules of the Road
      Chapter 10. Removal of Parked and Abandoned Vehicles (Refs & Annos)
        Article 1. Authority to Remove Vehicles (Refs & Annos)

West's Ann.Cal.Vehicle Code § 22651

§ 22651. Circumstances permitting removal

Effective: January 1, 2019
Currentness

<For Executive Order N-54-20 (2019 CA EO 54-20), relating to extensions for certain Department
of Motor Vehicles deadlines, adjustment of posting, filing, and notice requirements under the
California Environmental Quality Act, and changes to grocery store bag and recycling requirements
due to the COVID-19 pandemic, see Historical and Statutory Notes under Vehicle Code § 34620.>

A peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2 of the Penal Code, or a regularly employed and salaried employee, who is engaged in directing traffic or enforcing parking laws and regulations, of a city, county, or jurisdiction of a state agency in which a vehicle is located, may remove a vehicle located within the territorial limits in which the officer or employee may act, under the following circumstances:

(a) If a vehicle is left unattended upon a bridge, viaduct, or causeway or in a tube or tunnel where the vehicle constitutes an obstruction to traffic.

(b) If a vehicle is parked or left standing upon a highway in a position so as to obstruct the normal movement of traffic or in a condition so as to create a hazard to other traffic upon the highway.

(c) If a vehicle is found upon a highway or public land and a report has previously been made that the vehicle is stolen or a complaint has been filed and a warrant thereon is issued charging that the vehicle was embezzled.

(d) If a vehicle is illegally parked so as to block the entrance to a private driveway and it is impractical to move the vehicle from in front of the driveway to another point on the highway.

(e) If a vehicle is illegally parked so as to prevent access by firefighting equipment to a fire hydrant and it is impracticable to move the vehicle from in front of the fire hydrant to another point on the highway.

(f) If a vehicle, except highway maintenance or construction equipment, is stopped, parked, or left standing for more than four hours upon the right-of-way of a freeway that has full control of access and no crossings at grade and the driver, if present, cannot move the vehicle under its own power.

(g) If the person in charge of a vehicle upon a highway or public land is, by reason of physical injuries or illness, incapacitated to an extent so as to be unable to provide for its custody or removal.

(h)(1) If an officer arrests a person driving or in control of a vehicle for an alleged offense and the officer is, by this code or other law, required or permitted to take, and does take, the person into custody.

(2) If an officer serves a notice of an order of suspension or revocation pursuant to Section 13388 or 13389.

(i)(1) If a vehicle, other than a rented vehicle, is found upon a highway or public land, or is removed pursuant to this code, and it is known that the vehicle has been issued five or more notices of parking violations to which the owner or person in control of the vehicle has not responded within 21 calendar days of notice of citation issuance or citation issuance or 14 calendar days of the mailing of a notice of delinquent parking violation to the agency responsible for processing notices of parking violations, or the registered owner of the vehicle is known to have been issued five or more notices for failure to pay or failure to appear in court for traffic violations for which a certificate has not been issued by the magistrate or clerk of the court hearing the case showing that the case has been adjudicated or concerning which the registered owner's record has not been cleared pursuant to Chapter 6 (commencing with Section 41500) of Division 17, the vehicle may be impounded until that person furnishes to the impounding law enforcement agency all of the following:

(A) Evidence of his or her identity.

(B) An address within this state where he or she can be located.

(C) Satisfactory evidence that all parking penalties due for the vehicle and all other vehicles registered to the registered owner of the impounded vehicle, and all traffic violations of the registered owner, have been cleared.

(2) The requirements in subparagraph (C) of paragraph (1) shall be fully enforced by the impounding law enforcement agency on and after the time that the Department of Motor Vehicles is able to provide access to the necessary records.

(3) A notice of parking violation issued for an unlawfully parked vehicle shall be accompanied by a warning that repeated violations may result in the impounding of the vehicle. In lieu of furnishing satisfactory evidence that the full amount of parking penalties or bail has been deposited, that person may demand to be taken without unnecessary delay before a magistrate, for traffic offenses, or a hearing examiner, for parking offenses, within the county where the offenses charged are alleged to have been committed and who has jurisdiction of the offenses and is nearest or most accessible with reference to the place where the vehicle is impounded. Evidence of current registration shall be produced after a vehicle has been impounded, or, at the discretion of the impounding law enforcement agency, a notice to appear for violation of subdivision (a) of Section 4000 shall be issued to that person.

(4) A vehicle shall be released to the legal owner, as defined in Section 370, if the legal owner does all of the following:

(A) Pays the cost of towing and storing the vehicle.

(B) Submits evidence of payment of fees as provided in Section 9561.

(C) Completes an affidavit in a form acceptable to the impounding law enforcement agency stating that the vehicle was not in possession of the legal owner at the time of occurrence of the offenses relating to standing or parking. A vehicle released to a legal owner under this subdivision is a repossessed vehicle for purposes of disposition or sale. The impounding agency shall have a lien on any surplus that remains upon sale of the vehicle to which the registered owner is or may be entitled, as security for the full amount of the parking penalties for all notices of parking violations issued for the vehicle and for all local administrative charges imposed pursuant to Section 22850.5. The legal owner shall promptly remit to, and deposit with, the agency responsible for processing notices of parking violations from that surplus, on receipt of that surplus, the full amount of the parking penalties for all notices of parking violations issued for the vehicle and for all local administrative charges imposed pursuant to Section 22850.5.

(5) The impounding agency that has a lien on the surplus that remains upon the sale of a vehicle to which a registered owner is entitled pursuant to paragraph (4) has a deficiency claim against the registered owner for the full amount of the parking penalties for all notices of parking violations issued for the vehicle and for all local administrative charges imposed pursuant to Section 22850.5, less the amount received from the sale of the vehicle.

(j) If a vehicle is found illegally parked and there are no license plates or other evidence of registration displayed, the vehicle may be impounded until the owner or person in control of the vehicle furnishes the impounding law enforcement agency evidence of his or her identity and an address within this state where he or she can be located.

(k) If a vehicle is parked or left standing upon a highway for 72 or more consecutive hours in violation of a local ordinance authorizing removal.

(*l*) If a vehicle is illegally parked on a highway in violation of a local ordinance forbidding standing or parking and the use of a highway, or a portion thereof, is necessary for the cleaning, repair, or construction of the highway, or for the installation of underground utilities, and signs giving notice that the vehicle may be removed are erected or placed at least 24 hours prior to the removal by a local authority pursuant to the ordinance.

(m) If the use of the highway, or a portion of the highway, is authorized by a local authority for a purpose other than the normal flow of traffic or for the movement of equipment, articles, or structures of unusual size, and the parking of a vehicle would prohibit or interfere with that use or movement, and signs giving notice that the vehicle may be removed are erected or placed at least 24 hours prior to the removal by a local authority pursuant to the ordinance.

(n) Whenever a vehicle is parked or left standing where local authorities, by resolution or ordinance, have prohibited parking and have authorized the removal of vehicles. Except as provided in subdivisions (v) and (w), a vehicle shall not be removed unless signs are posted giving notice of the removal.

(*o*)(1) If a vehicle is found or operated upon a highway, public land, or an offstreet parking facility under any of the following circumstances:

(A) With a registration expiration date in excess of six months before the date it is found or operated on the highway, public lands, or the offstreet parking facility.

(B) Displaying in, or upon, the vehicle, a registration card, identification card, temporary receipt, license plate, special plate, registration sticker, device issued pursuant to Section 4853, or permit that was not issued for that vehicle, or is not otherwise lawfully used on that vehicle under this code.

(C) Displaying in, or upon, the vehicle, an altered, forged, counterfeit, or falsified registration card, identification card, temporary receipt, license plate, special plate, registration sticker, device issued pursuant to Section 4853, or permit.

(D)(i) The vehicle is operating using autonomous technology, without the registered owner or manufacturer of the vehicle having first applied for, and obtained, a valid permit that is required to operate the vehicle on public roads pursuant to Section 38750, and Article 3.7 (commencing with Section 227.00) and Article 3.8 (commencing with Section 228.00) of Title 13 of the California Code of Regulations.

(ii) The vehicle is operating using autonomous technology after the registered owner or person in control of the vehicle received notice that the vehicle's permit required for the operation of the vehicle pursuant to Section 38750, and Article 3.7 (commencing with Section 227.00) and Article 3.8 (commencing with Section 228.00) of Title 13 of the California Code of Regulations is suspended, terminated, or revoked.

(iii) For purposes of this subdivision, the terms "autonomous technology" and "autonomous vehicle" have the same meanings as in Section 38750.

(iv) This subparagraph does not provide the authority for a peace officer to stop an autonomous vehicle solely for the purpose of determining whether the vehicle is operating using autonomous technology without a valid permit required to operate the autonomous vehicle on public roads pursuant to Section 38750, and Article 3.7 (commencing with Section 227.00) and Article 3.8 (commencing with Section 228.00) of Title 13 of the California Code of Regulations.

(2) If a vehicle described in paragraph (1) is occupied, only a peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2 of the Penal Code, may remove the vehicle.

(3) For the purposes of this subdivision, the vehicle shall be released under any of the following circumstances:

(A) If the vehicle has been removed pursuant to subparagraph (A), (B), or (C) of paragraph (1), to the registered owner of, or person in control of, the vehicle only after the owner or person furnishes the storing law enforcement agency with proof of current registration and a valid driver's license to operate the vehicle.

(B) If the vehicle has been removed pursuant to subparagraph (D) of paragraph (1), to the registered owner of, or person in control of, the autonomous vehicle, after the registered owner or person furnishes the storing law enforcement agency with proof of current registration and a valid driver's license, if required to operate the autonomous vehicle, and either of the following:

(i) Proof of a valid permit required to operate the autonomous vehicle using autonomous technology on public roads pursuant to Section 38750, and Article 3.7 (commencing with Section 227.00) and Article 3.8 (commencing with Section 228.00) of Title 13 of the California Code of Regulations.

(ii) A declaration or sworn statement to the Department of Motor Vehicles that states that the autonomous vehicle will not be operated using autonomous technology upon public roads without first obtaining a valid permit to operate the vehicle pursuant to Section 38750, and Article 3.7 (commencing with Section 227.00) and Article 3.8 (commencing with Section 228.00) of Title 13 of the California Code of Regulations.

(C) To the legal owner or the legal owner's agency, without payment of any fees, fines, or penalties for parking tickets or registration and without proof of current registration, if the vehicle will only be transported pursuant to the exemption specified in Section 4022 and if the legal owner does all of the following:

(i) Pays the cost of towing and storing the vehicle.

(ii) Completes an affidavit in a form acceptable to the impounding law enforcement agency stating that the vehicle was not in possession of the legal owner at the time of occurrence of an offense relating to standing or parking. A vehicle released to a legal owner under this subdivision is a repossessed vehicle for purposes of disposition or sale. The impounding agency has a lien on any surplus that remains upon sale of the vehicle to which the registered owner is or may be entitled, as security for the full amount of parking penalties for any notices of parking violations issued for the vehicle and for all local administrative charges imposed pursuant to Section 22850.5. Upon receipt of any surplus, the legal owner shall promptly remit to, and deposit with, the agency responsible for processing notices of parking violations from that surplus, the full amount of the parking penalties for all notices of parking violations issued for the vehicle and for all local administrative charges imposed pursuant to Section 22850.5.

(4) The impounding agency that has a lien on the surplus that remains upon the sale of a vehicle to which a registered owner is entitled has a deficiency claim against the registered owner for the full amount of parking penalties for any notices of parking violations issued for the vehicle and for all local administrative charges imposed pursuant to Section 22850.5, less the amount received from the sale of the vehicle.

(5) As used in this subdivision, "offstreet parking facility" means an offstreet facility held open for use by the public for parking vehicles and includes a publicly owned facility for offstreet parking, and a privately owned facility for offstreet parking if a fee is not charged for the privilege to park and it is held open for the common public use of retail customers.

(p) If the peace officer issues the driver of a vehicle a notice to appear for a violation of Section 12500, 14601, 14601.1, 14601.2, 14601.3, 14601.4, 14601.5, or 14604, and the vehicle is not impounded pursuant to Section 22655.5. A vehicle so removed from the highway or public land, or from private property after having been on a highway or public land, shall not be released to the registered owner or his or her agent, except upon presentation of the registered owner's or his or her agent's currently valid driver's license to operate the vehicle and proof of current vehicle registration, to the impounding law enforcement agency, or upon order of a court.

(q) If a vehicle is parked for more than 24 hours on a portion of highway that is located within the boundaries of a common interest development, as defined in Section 4100 or 6534 of the Civil Code, and signs, as required by paragraph (1) of subdivision (a) of Section 22658 of this code, have been posted on that portion of highway providing notice to drivers that vehicles parked

thereon for more than 24 hours will be removed at the owner's expense, pursuant to a resolution or ordinance adopted by the local authority.

(r) If a vehicle is illegally parked and blocks the movement of a legally parked vehicle.

(s)(1) If a vehicle, except highway maintenance or construction equipment, an authorized emergency vehicle, or a vehicle that is properly permitted or otherwise authorized by the Department of Transportation, is stopped, parked, or left standing for more than eight hours within a roadside rest area or viewpoint.

(2) Notwithstanding paragraph (1), if a commercial motor vehicle, as defined in paragraph (1) of subdivision (b) of Section 15210, is stopped, parked, or left standing for more than 10 hours within a roadside rest area or viewpoint.

(3) For purposes of this subdivision, a roadside rest area or viewpoint is a publicly maintained vehicle parking area, adjacent to a highway, utilized for the convenient, safe stopping of a vehicle to enable motorists to rest or to view the scenery. If two or more roadside rest areas are located on opposite sides of the highway, or upon the center divider, within seven miles of each other, then that combination of rest areas is considered to be the same rest area.

(t) If a peace officer issues a notice to appear for a violation of Section 25279.

(u) If a peace officer issues a citation for a violation of Section 11700, and the vehicle is being offered for sale.

(v)(1) If a vehicle is a mobile billboard advertising display, as defined in Section 395.5, and is parked or left standing in violation of a local resolution or ordinance adopted pursuant to subdivision (m) of Section 21100, if the registered owner of the vehicle was previously issued a warning citation for the same offense, pursuant to paragraph (2).

(2) Notwithstanding subdivision (a) of Section 22507, a city or county, in lieu of posting signs noticing a local ordinance prohibiting mobile billboard advertising displays adopted pursuant to subdivision (m) of Section 21100, may provide notice by issuing a warning citation advising the registered owner of the vehicle that he or she may be subject to penalties upon a subsequent violation of the ordinance, that may include the removal of the vehicle as provided in paragraph (1). A city or county is not required to provide further notice for a subsequent violation prior to the enforcement of penalties for a violation of the ordinance.

(w)(1) If a vehicle is parked or left standing in violation of a local ordinance or resolution adopted pursuant to subdivision (p) of Section 21100, if the registered owner of the vehicle was previously issued a warning citation for the same offense, pursuant to paragraph (2).

(2) Notwithstanding subdivision (a) of Section 22507, a city or county, in lieu of posting signs noticing a local ordinance regulating advertising signs adopted pursuant to subdivision (p) of Section 21100, may provide notice by issuing a warning citation advising the registered owner of the vehicle that he or she may be subject to penalties upon a subsequent violation of the ordinance that may include the removal of the vehicle as provided in paragraph (1). A city or county is not required to provide further notice for a subsequent violation prior to the enforcement of penalties for a violation of the ordinance.

**Credits**

(Stats.1959, c. 3, p. 1701, § 22651. Amended by Stats.1959, c. 972, p. 3003, § 1; Stats.1960, 1st Ex.Sess., c. 59, p. 408, § 3; Stats.1963, c. 1004, p. 2271, § 2; Stats.1967, c. 543, p. 1891, § 1; Stats.1968, c. 749, p. 1452, § 1; Stats.1969, c. 1116, p. 2177, § 1; Stats.1970, c. 886, p. 1620, § 1; Stats.1971, c. 130, p. 172, § 1, operative May 3, 1972; Stats.1974, c. 545, p. 1327, § 211; Stats.1977, c. 73, p. 477, § 1; Stats.1977, c. 486, p. 1605, § 2; Stats.1977, c. 1129, p. 3624, § 2; Stats.1979, c. 831, p. 2874, § 1; Stats.1979, c. 909, p. 3123, § 2.3; Stats.1980, c. 1340, p. 4735, § 31, eff. Sept. 30, 1980; Stats.1981, c. 343, p. 1501, § 1; Stats.1982, c. 344, p. 1647, § 1; Stats.1983, c. 816, § 1; Stats.1983, c. 1017, § 3; Stats.1985, c. 1007, § 1; Stats.1985, c. 1126, § 5, eff. Sept. 28, 1985; Stats.1985, c. 1126, § 6, eff. Sept. 28, 1985, operative April 1, 1986; Stats.1986, c. 328, § 2; Stats.1986, c. 1236, § 2; Stats.1986, c. 1262, § 1; Stats.1987, c. 521, § 1, eff. Sept. 11, 1987; Stats.1988, c. 619, § 1; Stats.1988, c. 1008, § 3; Stats.1989, c. 331, § 1; Stats.1991, c. 90 (A.B.1297), § 68, eff. June 30, 1991; Stats.1991, c. 189 (A.B.544), § 40, eff. July 29, 1991; Stats.1992, c. 633 (A.B.1067), § 3; Stats.1992, c. 1242 (S.B.602), § 3; Stats.1992, c. 1244 (A.B.408), § 5, operative July 1, 1993; Stats.1993, c. 272 (A.B.301), § 42, eff. Aug. 2, 1993; Stats.1993, c. 614 (A.B.481), § 1; Stats.1993, c. 1093 (A.B.780), § 1.5; Stats.1994, c. 268 (A.B.3017), § 2; Stats.1994, c. 938 (S.B.1295), § 12, eff. Sept. 28, 1994; Stats.1994, c. 1220 (A.B.3132), § 60, eff. Sept. 30, 1994; Stats.1994, c. 1221 (S.B.1758), § 17; Stats.1995, c. 734 (A.B.1228), § 1; Stats.1996, c. 10 (A.B.1869), § 16, eff. Feb. 9, 1996; Stats.1996, c. 1142 (S.B.1797), § 8, eff. Sept. 30, 1996; Stats.1996, c. 1154 (A.B.3020), § 69, eff. Sept. 30, 1996; Stats.1996, c. 1156 (A.B.3157), § 3.7; Stats.1998, c. 118 (S.B.1186), § 11.5, operative July 1, 1999; Stats.1999, c. 22 (S.B.24), § 17.5, eff. May 26, 1999, operative July 1, 1999; Stats.2007, c. 453 (A.B.1589), § 1; Stats.2007, c. 749 (A.B.1165), § 4.5, operative Jan. 1, 2009; Stats.2008, c. 460 (A.B.2402), § 1; Stats.2008, c. 736 (A.B.2042), § 2; Stats.2009, c. 140 (A.B.1164), § 180; Stats.2010, c. 615 (A.B.2756), § 4; Stats.2011, c. 341 (S.B.565), § 4; Stats.2011, c. 538 (A.B.1298), § 4.5; Stats.2012, c. 181 (A.B.806), § 81, operative Jan. 1, 2014; Stats.2012, c. 769 (A.B.2679), § 38; Stats.2013, c. 605 (S.B.752), § 50; Stats.2018, c. 667 (A.B.87), § 1, eff. Jan. 1, 2019.)

West's Ann. Cal. Vehicle Code § 22651, CA VEHICLE § 22651

Current with urgency legislation through Ch. 17 of 2021 Reg.Sess

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.