No. 20-50345

# In the United States Court of Appeals

# for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JONATHAN EDWARD CHARLES ANDERSON,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Central District of California, Southern Division
The Honorable R. Gary Klausner, Presiding
No. CR-5:20-0071-RGK-1

## Appellant's Reply Brief

CUAUHTEMOC ORTEGA
Federal Public Defender
ASHWINI MATE
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012
213-894-1417

*Counsel for Defendant-Appellant*

# TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION ...........................................................................1

II. ARGUMENT ..................................................................................3

    A. The inventory search was not proper because the record proves that the deputies did not have a valid community caretaking reason for impounding the truck. .........................3

        1. The government conceded that the deputies needed a community caretaking reason to impound the truck before they searched it..........................................3

        2. The government's primary community caretaking rationale does not justify this inventory search because the deputies did not know whether Mr. Anderson's truck was improperly blocking the homeowner's access to his property at the time they searched the truck. .......................................4

            a. As an initial matter, the government's cited caselaw demonstrates that the deputies needed to have spoken to Mr. Wallace to ascertain his relationship to Mr. Anderson *before* searching the truck. ...................................5

            b. The unadulterated recordings made at the time of the incident reveal that the deputies could not have spoken to the homeowner before they searched the truck...........................7

        3. The government's fall-back "theft and vandalism" community caretaking rationale is illogical in this factual context.............................................14

    B. The deputies' failure to follow regulations confirms that the inventory search here was a pretext to rummage for contraband...........................................................16

i

# TABLE OF CONTENTS

**Page(s)**

1. The deputies failed to follow California law requiring that they explore a practical means of moving a vehicle before impounding it. ........................ 17

2. The deputies failed to follow SBCSD policies about creating a written inventory ......................................... 20

3. These were more than mere "administrative errors," and additional evidence demonstrates that the deputies had a clear pretext to rummage for contraband ................................................................. 23

III. CONCLUSION .......................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Florida v. Wells,*
 495 U.S. 1 (1990) ................................................................. 16, 22

*Hallstrom v. City of Garden City,*
 991 F.2d 1473 (9th Cir. 1993) ................................................... 14

*Miranda v. City of Cornelius,*
 429 F.3d 858 (9th Cir. 2005) ................................................... 3, 19

*Ramirez v. City of Buena Park,*
 560 F.3d 1012 (9th Cir. 2009) ................................................... 14

*South Dakota v. Opperman,*
 428 U.S. 364 (1976) ............................................................. 16, 21

*United States v. Caseres,*
 533 F.3d 1064 (9th Cir. 2008) ..................................................... 4

*United States v. Cervantes,*
 703 F.3d 1141 (9th Cir. 2012) ................................................... 3, 4

*United States v. Eric B.,*
 86 F.3d 869 (9th Cir. 1996) ........................................................ 2

*United States v. Garay,*
 938 F.3d 1108 (9th Cir. 2019) ................................................... 20

*United States v. Jackson,*
 682 F.3d 448 (6th Cir. 2012) ............................................. 6, 7, 19

*United States v. Maddox,*
 614 F.3d 1046 (9th Cir. 2010) ................................................... 17

*United States v. Magdirila,*
 962 F.3d 1152 (9th Cir. 2020) ................................................... 21

*United States v. Montero-Camargo,*
 208 F.3d 1122 (9th Cir. 2000) ................................................... 15

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases (cont…)**

*United States v. Sanchez,*
 612 F.3d 1 (1st Cir. 2010) ............................................................... 7

*United States v. Torres,*
 838 F.3d 113 (9th Cir. 2016)................................................ 5, 6, 18, 19

*United States v. Trujillo,*
 993 F.3d 859 (10th Cir. 2021)............................................................. 7

**State Statutes**

Cal. Veh. Code § 22651.................................................................... 17, 19

**Constitutional Provisions**

U.S. Const. amend IV ......................................................................... 1, 25

iv

## I. INTRODUCTION

The deputies' alleged "inventory" search of Mr. Anderson's truck was, in fact, a ruse to rummage for criminal contraband. At the time of the search, there was no legitimate community caretaking reason for the deputies to impound and thus inventory the vehicle. The only reason why the deputies' searched Mr. Anderson's truck was because they learned that he was a "career criminal" moments before. Using the inventory search exception to the Fourth Amendment's warrant requirement in this manner is strictly prohibited under Supreme Court precedent.

In its answering brief, the government has conceded that, under this exception, the deputies needed a community caretaking purpose before they could impound the truck. (GAB 19-20). However, both community caretaking rationales advanced by the government are unavailing in this factual context. (GAB 16). One rationale offered — that the officers needed to safeguard the truck from "theft or vandalism" — makes no sense. Mr. Anderson's truck was not parked on a public roadway, or in an apartment complex parking structure, or in a drugstore parking lot. He was parked in the driveway of a private residence that he believed belonged to his friend and told the deputies

as much. The only plausible community caretaking function for removing a truck so-parked was if that truck was somehow blocking the residence owner's access.

This case centers around whether the deputies determined if the homeowner was Mr. Anderson's friend and willing to take custody of the truck *before* the deputies decided to search it. If the deputies searched the truck before they spoke to the homeowner, then the inventory search was improper. And recordings from the night of the incident prove that that was exactly what happened.

It is rare that defense counsel can prove that a law enforcement officer's testimony in a suppression hearing is so plainly implausible and illogical based on unassailable recorded evidence from the night of the incident. Yet that is what we have here.

Most of the points made in the government's answering brief have been fully addressed in Mr. Anderson's opening brief. Mr. Anderson will address only those issues upon which further discussion might assist the Court. His failure to address any specific issue in this brief is not a waiver or concession. *See United States v. Eric B.*, 86 F.3d 869, 879, n.21 (9th Cir. 1996).

## II. ARGUMENT

**A. The inventory search was not proper because the record proves that the deputies did not have a valid community caretaking reason for impounding the truck.[1]**

**1. The government conceded that the deputies needed a community caretaking reason to impound the truck before they searched it.**

In its answering brief, the government conceded that a defendant's violation of the California Vehicle Code alone is insufficient to justify the impoundment and search of the defendant's vehicle. (GAB 19-20). Nor could they argue otherwise. It is clearly established in this Circuit that law enforcement officers cannot impound a vehicle based on statutory authority alone. *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012); *see also Miranda v. City of Cornelius*, 429 F.3d 858, 865 (9th Cir. 2005) ("An impoundment may be proper under the

---

[1] In the opening brief, Mr. Anderson argued that the court's alternative holding concerning the inevitable discovery doctrine was also not proper because it was not likely that a second lawful search would have occurred. (AOB 39-44). Notably, however, the government is not arguing that the inevitable discovery doctrine would apply here. (GAB 14) ("The government did not rely on that theory (inevitable discovery) below and does not do so on appeal."). Therefore, counsel will focus this reply on responding to the government's arguments concerning the community caretaking doctrine and whether the officer's intention was investigatory.

community caretaking doctrine if the driver's violation of a vehicle regulation prevents the driver from lawfully operating the vehicle, and also if it is necessary to remove the vehicle from an exposed or public location."). "'[A] valid caretaking purpose' is required." *Cervantes*, 703 F.3d at 1141. This was true even when a defendant was arrested and removed from the scene for violating a provision of the California Vehicle Code. *United States v. Caseres*, 533 F.3d 1064, 1074-75 (9th Cir. 2008). The government advances two community caretaking objectives that it believes were served by impounding Mr. Anderson's truck: 1) to remove the truck from blocking the homeowner's access to his property; and 2) to protect the truck from theft and vandalism. (GAB 16).

    **2.    The government's primary community caretaking rationale does not justify this inventory search because the deputies did not know whether Mr. Anderson's truck was improperly blocking the homeowner's access to his property at the time they searched the truck.**

The government's primary community caretaking rationale is that the deputies properly impounded and inventoried Mr. Anderson's truck because it was restricting the homeowner's access to his property. (GAB 27-32). But the record demonstrates that there is no way that the deputies knew that the truck was improperly parked at the time that

they searched it. (AOB 33-39). Based on Deputy Anderson's belt recording from the night of the incident, the only information the deputies knew when the time that they searched the truck was that the homeowner, Mr. Wallace, was friends with Mr. Anderson. (3-ER-305-07). Mr. Wallace could have given Mr. Anderson permission to park in his driveway or Mr. Wallace could have been borrowing the truck from Mr. Anderson. Mr. Wallace also could have been willing to take control of the truck on behalf of Mr. Anderson. In either case, Mr. Anderson's truck would not have been improperly blocking Mr. Wallace's access. The only way the deputies could have adduced that the truck was improperly parked was by talking to the homeowner.

> **a.** **As an initial matter, the government's cited caselaw demonstrates that the deputies needed to have spoken to Mr. Wallace to ascertain his relationship to Mr. Anderson *before* searching the truck.**

The government tried to argue that this case is analogous to the situation in *United States v. Torres* where an inventory search of a vehicle blocking cars in a private parking garage was found to be legal. (GAB 21-22); 828 F.3d 1113 (9th Cir. 2016). But the procedures the officers followed in *Torres* prove Mr. Anderson's point. In *Torres*, the officers impounded a vehicle because "the driver [could] not lawfully

5

drive it, there [wa]s no licensed passenger, and the vehicle [wa]s blocking a private driveway." (GAB 21-22); *Torres*, 828 F.3d at 1116-1118. That is, in *Torres*, the officers knew *before they searched the car* that: 1) the car was parked in a no-park red zone of an apartment complex parking lot perpendicular to several cars and blocking them; 2) there was no way to move it as neither occupant of the vehicle was capable of driving it at the time; and 3) the occupants did not know anyone in the apartment complex. *Id.* at 1116-17. It was only after they determined these facts that the officers decided to impound and search the car. *Id.* In other words, the officers had a clear community caretaking reason to impound and search the suspect vehicle. Here, on the other hand, the only information the deputies knew about the relationship between Mr. Anderson and the person in whose driveway he was parked was that they were friends. Mr. Anderson was not blocking anyone else.

The government's citation to *United States v. Jackson*, 682 F.3d 448 (6th Cir. 2012), is similarly misguided. (GAB 22). Like in *Torres*, the officers in *Jackson* first determined that the defendant and passenger were parked in the driveway of someone they did not know

*before* they decided to impound and search the car. *Id.*[2] In fact, unlike the defendant in *Jackson* who "did not indicate that he knew the homeowners," *id.* at 451 n.2, Mr. Anderson affirmatively told the deputies that he was parked at the home of a friend two minutes before they began to search the truck. (3-ER-305-307) (Mr. Anderson answers Deputy Peterson's question about whose house the car is parked at by saying "Just a friend."). As will be argued below, the deputies did not have any time to learn that Mr. Anderson was mistaken about his connection to the homeowner before they searched the car.

> **b.     The unadulterated recordings made at the time of the incident reveal that the deputies could not have spoken to the homeowner before they searched the truck.**

The district court clearly erred in crediting the deputies' after-the-fact declarations and testimony at the suppression hearing about the timeline of the evening. The unbiased recordings from the incident

---

[2] In the other out-of-circuit cases the government cited, the officers similarly knew that the vehicle posed a traffic obstruction or hazard before they made the decision to impound and search. *See United States v. Trujillo*, 993 F.3d 859, 862 (10th Cir. 2021) (car parked blocking a gate); *United States v. Sanchez*, 612 F.3d 1, 7-8 (1st Cir. 2010) (Lynch, C.J., concurring) (officers knew that a motorcycle was parked in a short-term public parking lot and would be there for too long since defendant would not be released soon).

prove that the deputies' claims were implausible. Both deputies asserted that Deputy Schuler was the officer who spoke to Mr. Wallace before Deputy Peterson conducted the search. (2-ER-251-52, 256). However, a review of Deputy Peterson's belt recording confirms that Deputy Schuler was talking to Mr. Anderson during the entire encounter up until 27 seconds before the search was initiated. (3-ER-306-307). Clearly, that would not be enough time for Deputy Schuler to walk up to the door, knock twice, wake up Mr. Wallace, get him to the answer the door, discuss the issue with him, find out he did not know Mr. Anderson, and alert Deputy Peterson to search.

The government's efforts to undermine these recordings defy logic. For example, the government tried to counter the idea that Deputy Schuler only had 27 seconds to talk to the homeowner, Mr. Wallace. (GAB 28). The 27 second timeframe is based on the fact that Mr. Anderson protested, "you can't check my truck…why can you search my truck," (3-ER-307), approximately 27 seconds after Deputy Schuler can be last heard questioning Mr. Anderson. (3-ER-306-307). The government argued that Mr. Anderson was only protesting the sight of Deputy Peterson walking toward the dropped keys, and not while the deputies were searching his truck because the search happened later

8

(giving the deputies more time to speak to the homeowner). (GAB 28). But Mr. Anderson's protest was phrased contemporaneously and this interpretation strains credulity. Why would any reasonable person contemporaneously object to an officer searching their vehicle just because that officer was moving to pick up their keys? A person is more likely to object by saying, "why are you getting my keys?" After all, at that point in the encounter, nobody had mentioned a search or towing, so there was no reason for Mr. Anderson to believe that anything like that was about to occur. (3-ER-301-307). The only reason for Mr. Anderson to have so-objected was if the deputies were, indeed, searching his truck at the time.

The government also argued that a question Mr. Anderson posed to the deputies a few moments later, "why you going to do that," (3-ER-308), demonstrated that a search of Mr. Anderson's truck had not yet begun, because the phrasing of that particular question related to a future event. (GAB 28). However, the government's argument is based on a misreading of the transcript and recording. Mr. Anderson's question was clearly made in response to the deputies' statement that they were *going to tow his truck in the future*. (3-ER-307-308). Thus, Mr. Anderson's follow-up question was about the future event of *towing* his

9

truck, and not *searching*. And if the phrasing of Mr. Anderson's questions is to be determinative, then Mr. Anderson's earlier contemporaneously-phrased question about the search demonstrates that *a search* was going on at that moment in time. (*Id*.).

Next, the government skewed the timeline by trying to isolate the dispatch log, (3-ER-311-313), and stating that it showed a four-minute and 41-second window — from the time Mr. Anderson was detained until the gun was found — during which Deputy Schuler could have conferred with the homeowner. (GAB 28-29). But when one lines up the dispatch log to Deputy Peterson's belt recording, Deputy Schuler was talking to Mr. Anderson during most of that window of time. (AOB 34-36; 3-ER-304-309). It is unclear how Deputy Schuler could be in two places at once — standing near Deputy Peterson's belt recorder talking to Mr. Anderson and standing at the front door to the house talking to the homeowner.

Acknowledging this problem, the government next pivoted and argued that Deputy Schuler had ample time from when he is last heard speaking to Mr. Anderson on Deputy Peterson's belt recorder until the gun was found — one minute and 50 seconds. (GAB 29). But to prove that the one minute and 50-second window was sufficient time for

10

Deputy Schuler to have spoken to Mr. Wallace, the government had to discredit the testimony of Mr. Wallace. (GAB 29-30). Specifically, the government argued that Mr. Wallace was mistaken about the timing of how long it took for him to speak with a deputy that night. (*Id*.; 2-ER-136).

Unlike the government, however, Mr. Wallace never wavered about the timing of the events that evening. Mr. Wallace clearly stated that it took at least one to two minutes for him to answer the door, and that the whole interaction with the deputies took approximately three to five minutes. (2-ER-135-136). Upon questioning about whether his recollection of these details was accurate, Mr. Wallace stated: "I'm positive, I'm sure." (*Id*.).

The government attempted to cast doubt on Mr. Wallace's general ability to recall information simply because Mr. Wallace did not remember the precise date on which he was re-interviewed. (GAB 30). However, Mr. Wallace acknowledged he could not remember the exact date stating that he was "not sure when," but that he believed "[i]t was a few weeks later." (2-ER-138).

11

There is simply no reason to discredit Mr. Wallace's testimony.[3] It is perfectly logical that someone would more clearly remember being woken up in the middle of the night by police than they would recall the exact timing of a short interview that took place at a much later time during their daily activities.

Since Mr. Wallace recalled that his entire interaction with Deputy Schuler took three to five minutes, and Deputy Schuler only had one minute and 50 seconds from the last time he is heard talking to Mr. Anderson until the time the gun was found, it is simply not possible for this conversation to have taken place before the deputies searched Mr. Anderson's truck.

But assuming for the sake of argument that the government's strained reading of the record is correct — that Mr. Wallace's unbiased testimony is not to be trusted and Mr. Anderson's contemporaneous objection to the officer's searching his truck did not mean that they were searching his truck — Deputy Schuler still, at most, had one minute and 50 seconds to find out whether Mr. Wallace was willing to

---

[3] There is also no indication that the district court discredited Mr. Wallace's testimony. (1-ER-11).

take responsibility for the truck. (AOB 36-37; GAB 29-30). Within that one minute and 50 seconds, Deputy Schuler, again, had to walk up to the door, knock twice, wake up Mr. Wallace, get him to the answer the door, discuss the issue with him, find out he did not know Mr. Anderson, alert Deputy Peterson to search, and then Deputy Peterson would have to have begun to search, found the gun, located the serial number at night, read it, and called it in. It is logistically impossible for them to have accomplished all the above in less than two minutes.

This Court's inquiry should end here. The recorded evidence demonstrates that it was implausible and illogical for the deputies to have known that the truck was not parked legally or with permission when they searched it. The deputies, therefore, had no community caretaking reason for impounding, and thus searching, the truck.

The district court clearly erred by crediting the unreliable statements of the deputies made during litigation several months after the incident when the unadulterated recordings from the night of the incident, which are far more reliable, tell a different story. (1-ER-10-11) ("The only evidence before the Court at this time, other than speculation, *from the testimony of the witnesses*, is that they did talk to the homeowner before they searched the car.") (Emphasis added). Even

13

the court did not seem sure of its findings, stating immediately after that "even if they didn't [speak to the homeowner before], then [t]he [government] has the doctrine of inevitable discovery that may play a part in this."). (1-ER-11). And, as will be argued below, there was reason for the court to be unsure as there were many "discrepancies and inconsistencies" with the deputies' testimony. (1-ER-10); *see infra* section II.B.3.

### 3. The government's fall-back "theft and vandalism" community caretaking rationale is illogical in this factual context.

The government's fall-back "theft and vandalism" rationale does not work in a situation where the vehicle is parked in the driveway of a *private residence*. If that were the case, then every single car that the residents of the Ninth Circuit park in the driveways of their, or their friends', homes would be subject to a law enforcement searches without a warrant. That simply cannot be true.

The government's argument finds no support in the cases it cited, as those cases involve publicly parked vehicles. (GAB 22-23, 24) (citing *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1025 (9th Cir. 2009)(car parked outside a drugstore, causing officers to worry about the city's liability for the vehicle), and *Hallstrom v. City of Garden City*, 991 F.2d

14

1473 1477 n.4 (9th Cir. 1993) (car parked in a public lot)). (GAB 22-23, 24).

Nor does it matter that the government tried to add that this private driveway was in a "high crime area." (GAB 24). This conclusory assertion that the deputies knew Phelan to be a "high crime area" was unsupported by any empirical data or statistics, either at trial or on appeal. (2-ER-150-151). Without the required evidentiary support, the deputies' "high crime area" assertion should carry no weight as it is highly problematic. *See United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000) ("The citing of an area as 'high-crime' requires careful examination by the court, because such a description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity."). Taken to its logical conclusion in this factual context, this assertion would permit law enforcement officers to impound and search any unattended vehicle parked in the private driveway of a resident of a poverty-stricken neighborhood, or a neighborhood that is populated primarily by minority groups. Again, that simply cannot be true and has no support in the law.

15

**B.    The deputies' failure to follow regulations confirms that the inventory search here was a pretext to rummage for contraband.**

Without a community caretaking rationale, the inventory search was unjustified, and the remaining evidence in the record confirms that the search was a pretext to rummage for contraband. Using the inventory search exception to conduct an investigatory search is unconstitutional. *Florida v. Wells*, 495 U.S. 1, 4 (1990).

To ensure that law enforcement does not use the inventory exception in such a manner, the Supreme Court has repeatedly stressed the importance of local policies and laws to regulate such searches. *Id.*; *see also South Dakota v. Opperman*, 428 U.S. 364, 383 (1976) (Powell, J., concurring) (finding reasonable only those "[i]nventory searches [that] are conducted in accordance with established police department rules or policy and occur whenever an automobile is seized…."). Thus, a law enforcement officer's failure to follow local regulations governing inventory searches is significant evidence that the deputies' motive was, in fact, investigatory.

The deputies here failed to follow relevant California law and San Bernardino County Sherriff Department ("SBCSD") policies that were intended to guide their discretion when it comes to inventory searches.

16

These failures, plus other evidence in the record, demonstrate that the deputies had no administrative purpose for searching Mr. Anderson's truck.

### 1. The deputies failed to follow California law requiring that they explore a practical means of moving a vehicle before impounding it.

In the opening brief, (AOB 40-41), Mr. Anderson argued that under California law the deputies had to explore a practical means of moving the truck first before impounding and searching it. *See* Cal. Veh. Code § 22651(d) (stating that peace officers can only remove a vehicle when that "vehicle is illegally parked so as to block the entrance to a private driveway and *it is impractical to move the vehicle* from in front of the driveway to another point on the highway.") (Emphasis added). This Court has already found that where the law requires law enforcement to investigate alternatives, they are obligated to do so. *United States v. Maddox*, 614 F.3d 1046, 1049 (9th Cir. 2010) (citing *United States v. Wanless*, 882 F.2d 1459, 1463 (9th Cir. 1989)).

In response, the government relied on several cases to argue that that the deputies were not required to offer Mr. Anderson the opportunity to contact someone to move the truck. (GAB 32-26). But these cases did not involve the same laws or factual premise presented

17

here where: a) a provision of California law required the deputies to determine a practical alternative to impoundment in this context; and b) the defendant, himself, offered the deputies such an alternative.

In other words, Mr. Anderson was not requiring the deputies to independently seek out and exhaust all alternatives to impoundment; rather, an alternative was offered, and the law required the deputies to at least inquire about the practicality of that offer. *C.f., Torres*, 828 F.3d at 1119 n.2 (no policy of the police department compelled the officers to "exhaust alternatives" before they may impound a vehicle). As noted in the opening brief, the offered friend was awake and could have been there faster than the tow truck. (AOB 41).

The government next tried to argue that the provision of the California Vehicle Code related to impounding a vehicle blocking a private driveway was inapplicable because the reason for impounding Mr. Anderson's truck was that he was not licensed, "not solely because it was blocking Wallace's driveway." (GAB 33). Yet, earlier in their brief, the government conceded, and its cited cases demonstrate, that a violation of the vehicle code is not sufficient on its own to permit impoundment. (GAB 19-22). Impoundment still must be justified based on the location of the vehicle and whether it threatens community

18

safety. *Miranda*, 429 F.3d at 865 (finding that a violation of a traffic regulation could justify impoundment if a driver can't remove a vehicle from a *public* location). Therefore, the only reason the deputies could have relied on to justify impounding Mr. Anderson's truck was if it was blocking Mr. Wallace's driveway, which is why section 22651(d) is the only relevant provision of California law.

The officers in *Jackson*, *Torres*, and *Miranda* (cases cited by the government) either followed such procedures or were found to have critically failed by not doing so.[4] *See supra* section II.A.2.a. The deputies' failure to follow these regulations should be similarly fatal to the government's argument that the search here was not pretextual.

---

[4] The government's reliance on *Miranda* is confusing. In *Miranda*, this Court found that "'a policy of impounding the car without regard to whether the defendant can provide for its removal is patently unreasonable if the ostensible purpose for impoundment is for the 'caretaking' of the streets.'" *Miranda*, 429 F.3d at 865 (citing *United States v. Duguay*, 93 F.3d 346, 352 (7th Cir. 1996)).

### 2. The deputies failed to follow SBCSD policies about creating a written inventory. [5]

The deputies, also, more importantly, failed to create a written inventory as required by the SBCSD's inventory policy. (3-ER-347, 350). To diminish the significance of this, the government relied heavily on *United States v. Garay*, 938 F.3d 1108, 1111 (9th Cir. 2019), where this Court found that the officers involved in an inventory search had substantially complied with the police department's inventory policy although they failed to list every item found on the inventory form. (GAB 36-37). But as Mr. Anderson explained in the opening brief, (AOB 48), in *Garay*, the officers *did* substantially comply with the police department policy (and the purpose behind the inventory search exception) by safeguarding the property from the wrecked car in the evidence room and producing a written understanding of where the property was located on the CHP Form. 983 F.3d 1110-1112. The same

---

[5] In the answering brief, the government relied on a policy statement concerning the procedures that San Bernardino deputies must follow when a vehicle is abandoned. (GAB 42). But the deputies did not rely on this provision, nor could it be credibly said that the vehicle was abandoned since Mr. Anderson was offering to have a friend retrieve it. (GAB 42).

20

was true in the other case the government relied on, *United States v. Magdirila*, 962 F.3d 1152, 1158 (9th Cir. 2020), where the officers listed the property on a police report and referenced that report on the CHP Form.

Here, there was no written inventory or notation listed anywhere in any of the records produced in this case. All of Mr. Anderson's property in the truck, including a speaker, tools, a watch, and sunglasses (amongst others), were simply towed and left in his truck in the lot. One of the purposes of the inventory exception is to safeguard the defendant's property against unproveable theft. *See Opperman*, 428 U.S. at 369. Crucially, the deputies in this case admitted to having written a list of items like the ones found in Mr. Anderson's truck in another case. (2-ER-119-120, 122).[6] So why not do that here? Simply put, because the deputies were not interested in conducting an inventory.

---

[6] The government also argued that the officer complied by having the tow truck driver sign the form and documenting the condition of the truck. (GAB 38). But neither of these actions have anything to do with creating a written inventory of the items contained within the truck to safeguard them from theft.

21

The government attempted to dismiss the deputies' failure to satisfy the goal of the inventory exception by arguing that the deputies did not see anything of value worth listing and, in any event, the photographs captured some of the items. (GAB 38). But, the law does not allow a deputy to decide whether any given item has sufficient worth or value to be included in an inventory form. Nor did the government identify any precedent which would permit photographs to take the place of an inventory list, particularly where, as here, the deputies admitted they did not take photographs of all areas of the truck. (2-ER-124-126).

The government implicitly recognized that the deputies did not substantially comply with relevant policies in impounding Mr. Anderson's truck when it claimed that the policy manual is not a "set of rigid rules." (GAB 38). Yet, the government conceded that the Supreme Court has repeatedly found that such policies and procedures are vital to ensuring that an inventory search is not done pretextually. (GAB 39)(citing *Wells*, 495 U.S. at 4). Thus, conversely, failing to follow such policies is demonstrative that the inventory exception was used as a pretext, just as it was here.

3. **These were more than mere "administrative errors," and additional evidence demonstrates that the deputies had a clear pretext to rummage for contraband.**

The government argued that any "administrative" errors in the inventory process should not invalidate the deputies inventory search, and that something more is required to prove it was pretextual. (GAB 39). But these are not mere administrative errors, they demonstrate that the deputies did not have the intent to inventory the truck. In any event, more exists here. As argued above, the deputies did not have a valid community caretaking reason at the time they searched the truck. That, alone, invalidates the search.

Moreover, the deputies' use of the inventory exception as a pretext is apparent from the record. Deputy Peterson's belt recording, when compared with the dispatch log, demonstrates that less than a minute after the dispatcher reported that Mr. Anderson was a "career criminal," the deputies began to search the vehicle. (AOB 35-36). The government tried to state that this timing is not suggestive because it corresponded with when the deputies learned that he had an expired license. (GAB 40). Yet, Mr. Anderson told the deputies his license was expired well before that. (3-ER-305; AOB 35-36). Moreover, the fact that

23

Mr. Anderson was driving on an expired license would not have justified the search anyway. Thus, this timing is very significant.

The deputies were also repeatedly caught in several "discrepancies and inconsistencies" during the suppression litigation indicating they had something to hide. (1-ER-10). The opening brief delves into some of these "discrepancies and inconsistencies" in greater detail and counsel will not repeat all those instances here. (AOB 17-20). But, by way of example, Deputy Peterson stated in a declaration that Mr. Anderson was attempting to flee by throwing his keys after he parked and exited the truck, but before Deputy Peterson himself exited his patrol car. (2-ER-249-50). But on Deputy Peterson's belt recorder, you can clearly hear keys dropping *after* Deputy Peterson has exited his patrol car and demanded that Mr. Anderson drop the contents of his hands. (3-ER-304; Ex. 1A at 00:57).

There are many reasons to doubt the deputies motives for searching Mr. Anderson's truck when they did not: 1) tell the truth about relevant information like when Mr. Anderson dropped his keys; 2) talk to the homeowner before searching Mr. Anderson's truck; 3) determine if the truck was abandoned or inquire about the practicality of the offered friend moving the truck; and 4) create an actual inventory

24

of the items in the truck. These missing pieces in the record all point to some after-the-fact attempts to justify searching the truck.

What the record does affirmatively show is that the deputies dove right into the truck less than a minute after finding out Mr. Anderson was a "career criminal," all while asking Mr. Anderson several questions indicating that they were suspicious of him. (3-ER-306-307; AOB 35-36).

The search was not a proper inventory search, but an investigation for criminal contraband. The deputies were not justified in impounding a truck that, as far as they knew, was parked legally in a private driveway at the time they searched it. The search violated the Fourth Amendment, warranting suppression of the evidence.

25

## III. CONCLUSION

For all the above-mentioned reasons and those in the Opening

Brief, Mr. Anderson respectfully requests that this Court reverse the

district court's denial of his suppression motion and vacate his

conviction.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: November 15, 2021    By  */s/ Ashwini Mate*
                              ASHWINI MATE
                              Deputy Federal Public Defender
                              Attorney for Petitioner-Appellant

26

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** _____ No. 20-50345_____

I am the attorney or self-represented party.

**This brief contains _5,800_words,** excluding the items exempted by Fed. R.

App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.

32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5),
Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
[ ] it is a joint brief submitted by separately represented parties;
[ ] a party or parties are filing a single brief in response to multiple briefs; or
[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _____s/Ashwini Mate_____ **Date** ___Nov. 15, 2021___
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8**                                                                        *Rev. 12/01/18*